FIFTH DIVISION
August 20, 2010

No. 1-09-0976

| | | |
|---|---|---|
| *In re* ESTATE OF BOZENNA MICHALAK, | ) | |
| a Disabled Person | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of |
| (Jacqueline H. Zagorski, | ) | Cook County, |
| | ) | |
| Petitioner-Appellee, | ) | 07 P 4827 |
| | ) | |
| v. | ) | The Honorable |
| | ) | Maureen E. Connors, |
| Robert and Jolanta Kaleta, | ) | Judge Presiding. |
| | ) | |
| Respondents-Appellants). | ) | |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

In the instant appeal we consider whether the probate court's order amending a disabled ward's revocable trust was against the manifest weight of the evidence. Robert and Jolanta Kaleta appeal from an order granting Jacqueline Zagorski's petition to amend Bozenna Michalak's trust to remove the Kaletas and replace Zagorski as the successor trustee and contingent beneficiary under the trust. The Kaletas maintain that section 11a-18(a-5) of the Probate Act of 1975 (755 ILCS 5/11a-18(a-5) (West 2008)) does not allow amendment of a ward's preexisting trust for any reason other than tax purposes. They further contend that: (1) reappointment of Michalak's guardian *ad litem* after adjudication and continued participation in the proceedings finds no support in the Probate Act; (2) the guardian *ad litem* acted beyond the

1

scope of her authority in presenting her report; (3) the trial court abused its discretion in denying respondents oral discovery and leave to file an answer to the petition; (4) hearsay contained in the guardian *ad litem*'s report was erroneously admitted at the hearing on the petition to amend the trust; and (5) the trial court's finding was against the manifest weight of the evidence. The Kaletas also appeal from a subsequent order allowing a reverse mortgage on Michalak's home. For the following reasons, we affirm.

BACKGROUND

In October and November 2006, attorney John Kuranty met with Bozenna Michalak, an 83-year-old widow, to execute an estate plan. Michalak came alone to the consultation and spoke with Kuranty in Polish. They discussed her assets and dispositional options in great detail. Michalak stated that she was widowed and had no children. With respect to any extended family, Michalak "made reference to somebody in Michigan, somebody greedy *** [who is] not really a family member." Kuranty prepared a revocable trust, the corpus of which consisted only of Michalak's home, titled "The Bozenna U. Michalak Revocable Trust Dated November 6, 2006" (Michalak's trust). During the second meeting with Michalak, Kuranty reviewed and translated the entire trust document into Polish for Michalak. According to Kuranty, Michalak did not have diminished or insufficient capacity and understood everything Kuranty explained during their two consultations. Under the terms of the trust, Robert Kaleta would become the trustee in the event of Michalak's incapacity; the Kaletas would also become the beneficiaries upon Michalak's death.

In January 2007, Jacqueline Zagorski, Michalak's niece, was alerted by Chicago police

2

officers of a potential exploitation of Michalak's financial affairs. Zagorski then accompanied Michalak to various banks to have her name added to Michalak's accounts. When she visited Michalak, Zagorski observed several conversations between Michalak and her neighbors, the Kaletas. However, because Zagorski does not speak Polish she did not understand what was being said. Zagorski did not visit Michalak again until she was alerted by a bank in May 2007 that further "attempts were being made on her accounts."

In June 2007, during a cleanup effort at Michalak's house, Robert Kaleta came to the house between 2 and 10 times to assist Zagorski and her husband. According to Zagorski, Kaleta commented to her,"Well, I'm the boss here as far as the house goes," and said "something along the same lines that the house was coming to him." In turn, Zagorski applied for guardianship of Michalak

Dr. Farhan Ibrahimi evaluated Michalak for the guardianship petition proceedings on June 15, 2007, and found her to be "incapable of making personal or financial decisions." He diagnosed her with Alzheimer's disease. Dr. Ibrahimi did not indicate that Michalak had any diminished capacity at the time she executed her revocable trust, nor did he opine how far the disease had progressed. In 2007, Michalak was able to bathe herself, dress herself, to a "small extent" cook for herself, and walk outside her home to visit her neighbors. Marcella Horan was appointed as guardian *ad litem* for purposes of the adjudication proceedings. In turn, Michalak was adjudicated a disabled adult, and Zagorski was appointed plenary guardian.

In May 2007, Zagorski received a letter from the assessor indicating that Michalak's senior citizen exemption would not be renewed because of a change in titling of her home.

Zagorski learned that the house was held in trust. A citation to tender the trust document was served upon attorney Kuranty, who appeared in court on November 15, 2007 and tendered the instrument. On that occasion, Kuranty expressed concern over the possibility that Michalak, as a native Polish speaker, may have been unjustly declared incompetant due to a communication problem with Horan. According to Zagorski, Michalak had told her she did not recall any details about the trust. When Zagorski asked whether Michalak signed any papers to give her house to Robert Kaleta, Michalak said, "I may have said it, but I didn't mean it." Zagorski did not ask Michalak any further questions because "she didn't want to seem like [she] was asking [the ward] for anything."

On December 13, 2007, pursuant to Zagorski's motion, Horan was reappointed as Michalak's guardian *ad litem* and ordered to "conduct further investigation into [Michalak's] assets, etc." and report to the court on February 13, 2008. On that date, Horan presented a report advocating invalidation of Michalak's trust, suggesting undue influence by the Kaletas. Horan's report recounted interviews with nine people. The court entered an order reflecting Horan's presentation of the report and continuing the matter to allow Zagorski to present a petition to amend the trust.

On March 11, 2008, Zagorski filed a verified petition to amend Michalak's trust, pursuant to section 11a-18(a-5) of the Probate Act (755 ILCS 5/11a-18(a-5) (West 2008)), serving the contingent trustees and beneficiaries to the trust, Robert and Jolanta Kaleta. Zagorski alleged that Michalak was under insufficient or diminished capacity when she executed the trust. The Kaletas filed a motion to dismiss Zagorski's petition. On July 17, 2008, during argument on the

4

motion, without notice to respondents, Horan presented to the court a document titled, "Summary of Recent Pleadings Concerning Trust Amendment and Supplemental Report of Guardian *Ad Litem*," again containing detailed recitals of the same conversations summarized in her previous report and also recommending denial of the Kaletas' motion.

The Kaletas noticed discovery depositions of Zagorski for August 21, 2008, and of Michalak for August 22, 2008. On August 21, 2008, upon emergency motions filed by both the Zagorski and Horan, the trial court quashed the Kaletas' notices and denied their request for leave to file an answer to Zagorski's petition *instanter*. The court further directed that any response to the petition to amend the trust be filed by July 31, 2008.

A five-day bench trial was held between August 28, 2008, and March 10, 2009. Zagorski acknowledged that she did not see Michalak from October through December 2006. Nor did Zagorski know anyone who saw Michalak in November 2006. Over the hearsay objection of respondents, Zagorski testified that since January 2007, Michalak told her that "she wanted to remain in her house and that when something did happen to her she wanted [her house] to belong to [Zagorski] and her husband."

From July through September 2007, Zagorski did not object to the Kaletas taking Michalak to their house for a visit, provided she knew her whereabouts. However, after being appointed plenary guardian, Zagorski forbid Michalak to visit or speak with the Kaletas without her permission, and on October 9, 2007, had her lawyer send the Kaletas a letter stating as such. Nevertheless, Zagorski acknowledged that in the 10 year period prior to January 2007, when the Kaletas were Michalak's neighbors, Mr. Kaleta drove Michalak to the bank and cut her grass,

and Michalak's house was in decent condition. After the Kaletas no longer lived next door that was no longer so.

In her initial report regarding the trust, Horan stated that during her conversation with Robert Kaleta, she was able to understand him despite his Hispanic accent. However, at trial, Horan acknowledged that Kaleta was Polish, not Hispanic, and that she "misunderstood his accent" and "could not tag his accent correctly." On cross-examination, Horan admitted that her reported conversations with Officer Jane Fudacz, Bernadette Baran, Tracey Fondren, Ann Beres, Jean Kinsinger, and Lillian Raff did not address the issue of Michalak's mental capacity on November 6, 2006, or the issue of whether Michalak wished to amend her trust document. Horan further testified that, although Kuranty was the only person she interviewed who gave information as to Michalak's mental capacity on November 6, 2006, she disregarded his statement in forming her conclusion in the report. In advocating for invalidation of the trust, Horan believed Michalak was confused when she executed the trust because the trust mentioned children, and Michalak had no children. However, Horan did not recall whether she asked Kuranty any questions concerning this error. Horan also found Jolanta Kaleta's act of driving Michalak to Kuranty's office and waiting outside to be suggestive of undue influence.

Regarding Michalak's diminished capacity, Horan based her opinion upon her experience in six to eight previous appointments as guardian *ad litem* over the course of three or four years. Further, in response to questioning about any visitation with the Kaletas, Michalak told Horan, "Who is Robert Kaleta? Oh, yes, we were friends and neighbors once, but he became a little crook, so I don't bother with him anymore. *** We're not on friendly terms." Regarding the

trust property specifically, Michalak stated, "no, no, no," she "[did] not want the Kaletas to get her home." Michalak stated she wanted her house to go to "my niece," Zagorski.

Robert and Jolanta Kaleta are also native Polish speakers and testified at trial through an interpreter. The Kaletas testified that they moved next door to Michalak in 1998 and lived there for over five years. They began helping Michalak because she asked and because another helpful neighbor had died. During that time, the Kaletas would see Michalak several times every day. Robert would do Michalak's shopping, pay her bills, cut her grass, remove snow from her sidewalk, and help her around the house if things were broken. Jolanta Kaleta would take Michalak to the bank, to the restaurant, to the veterinarian, and to the eye doctor. Michalak did not offer to pay Jolanta for the chores or errands that she did, nor did Jolanta ask for anything. The Kaletas testified that even when they moved to Bridgeview, they would still see Michalak three to four times per week, and Michalak would call them almost every day. Michalak would ask for help, as no one else was helping her. Michalak would always spend the holidays with the Kaletas, even after they moved. The Kaletas never saw Zagorski during any of their visits to Michalak. Michalak would only occasionally mention a relative who never visited her and remarked that the relative never invited her over for holidays.

In November 2006, on the first visit to Kuranty's office, Michalak merely called Jolanta and asked her to come over to her house. When Jolanta arrived, Michalak asked Kaleta to drive her to an address she showed her, saying only that she had to take care of something. Michalak was inside for about an hour. They returned another one or two times. On the second visit, Michalak mentioned that she wanted to sign over the house to the Kaletas for the help and care

they had provided. At no time did Jolanta go into the office, meet with any attorney, or see any attorney Michalak may have met. The first time the Kaletas saw the trust document was when Michalak gave them a copy of it at their home. Michalak and the Kaletas then discussed the trust. According to the Kaletas, Michalak looked very well, could communicate just fine, and was reasonable. Through September 2007, when Michalak would visit the Kaletas' home for four to five hours, she appeared physically fine, conversed and had no problem understanding. Through the fall of 2007, there were three or four occasions when, in response to a call from Zagorski, the Kaletas went to Michalak's house to help clean it. The Kaletas denied that Robert ever told Zagorski that he was "the owner or boss" of Michalak's house. The Kaletas claimed that Zagorski stated they could no longer see Michalak for reasons unknown to them.

At the close of the trial, the court found that the capacity of Michalak was not really the issue before the court, despite "some pretty glaring errors" in the trust document, including references to children in three places and the naming as third successor trustee a bank with which Michalak had no history. The trial court found that "what [was] at issue [was] the guardian's authority now to request to amend the trust." The court found that Zagorski was a credible witness. However, based on conversations detailed in Horan's initial report, the judge found questionable the Kaletas' testimony that they continued to have contact with Michalak three to four times a week after moving to Bridgeview. The court reasoned that the Kaletas' claim of these continued visits was impossible to reconcile with Officer Fudacz's and Tracey Fodren's observations that on two separate days the house was a mess. The trial court found dispositive Horan's testimony that Michalak called Robert Kaleta a "crook" and said she did not want the

8

Kaletas to get her home. The court determined that "it seems very clear from the testimony of the guardian and *** the guardian *ad litem* as to what the wishes of the ward are."

The trial court also disagreed with the Kaletas' legal argument that section 11a-18(a-5)(11) of the Probate Act permits amendment of a revocable trust only for the purpose of making advisable use of changes in tax laws. The court granted Zagorski's petition and allowed amendment of the trust such that Zagorski was substituted as the successor trustee and Michalak's heirs at law as the successor beneficiaries. Judgment was entered on March 10, 2009. A subsequent order of March 24, 2009, approved the specific language amending the ward's trust. A timely notice of appeal was filed by respondents. On October 28, 2009, the trial court granted the guardian leave to seek a reverse mortgage against the trust property. In turn, respondents amended their notice of appeal to also seek relief from this order.

ANALYSIS

We first address the threshold issue raised by Zagorski regarding the Kaletas' standing to challenge the probate court order. In response, the Kaletas maintain that Zagorski has forfeited the issue of standing by not properly arguing and presenting it below. However, standing is not merely a procedural technicality but, rather, is a component of justiciability which vests a court with subject matter jurisdiction over a case under our constitution. *In re Estate of Henry*, 396 Ill. App. 3d 88, 93, 919 N.E.2d 33, 38 (2009). "Standing in Illinois requires 'some injury in fact to a legally cognizable interest.' " *In re Estate of Henry*, 396 Ill. App. 3d at 93, 919 N.E.2d at 38, quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492, 524 N.E.2d 561, 574-75 (1988). The issue of subject matter jurisdiction cannot be waived and may be raised at

9

any time. *In re Estate of Henry*, 396 Ill. App. 3d at 94, 919 N.E.2d at 38. Thus, the issue of standing has not been forfeited.

Zagorski asserts that her cited authority, *In re Estate of Henry*, is dispositive and mandates a finding that the Kaletas lack standing. In *In re Estate of Henry*, the court held that a caretaker and executor lacked standing to challenge the court's amendment of a ward's will where the interests in the ward's property would not vest until the death of the ward. *In re Estate of Henry*, 396 Ill. App. 3d at 97-98, 919 N.E.2d at 41-42. The caretaker and executor lacked standing because the fact that the ward was still alive negated any present vested interest in the assets resulting only in expectancies. *In re Estate of Henry*, 396 Ill. App. 3d at 98, 919 N.E.2d at 42. See also *In re Estate of Feinberg*, 235 Ill. 2d 256, 279, 919 N.E.2d 888, 902 (2009) (no interest vested in grandchildren that could be divested at the time of settlor's death because the terms of his testamentary trust were subject to change; at most, they had a mere expectancy).

However, here Zagorski's argument is blunted by the fact that the trust instrument upon execution created an *inter vivos* trust, as opposed to a will, which does not take effect until a testator's death. An expectancy interest is the " ' "interest of a person who merely foresees that he might receive a future beneficence, such as the interest of an heir apparent *** or of a beneficiary designated by a living insured who has a right to change the beneficiary." ' " *In re Marriage of Centioli*, 335 Ill. App. 3d 650, 656, 781 N.E.2d 611, 616 (2002), quoting *In re Marriage of Weinstein*, 128 Ill. App. 3d at 244, 470 N.E.2d at 559, quoting *In re Marriage of Peshek*, 89 Ill. App. 3d 959, 964, 412 N.E.2d 698, 702 (1980). The principal distinction between a will and a trust is that in the former, the beneficiary has no interest until the death of the

testator, while in the latter, beneficiary has an interest the moment the trust is created. *Favata v. Favata*, 74 Ill. App. 3d 979, 982, 394 N.E.2d 443, 446 (1979). The fact that a beneficiary's actual enjoyment of the trust *res* is contingent upon the settlor's death does not negate the existence of a present interest in the beneficiary during the settlor's lifetime. *In re Estate of Zukerman*, 218 Ill. App. 3d 325, 332, 578 N.E.2d 248, 253 (1991), citing *Farkas v. Williams*, 5 Ill. 2d 417, 425-26, 125 N.E.2d 600, 605 (1955), and *In re Estate of Petralia*, 32 Ill. 2d 134, 137-38, 204 N.E.2d 1, 3 (1965).

These same principles guide our analysis here. Under article II of her *inter vivos* trust, Michalak was the primary beneficiary and reserved the right to amend or revoke the trust. Article III of the trust provided that the Kaletas would become the successor beneficiaries of the real estate owned by Michalak and the balance of the trust estate, upon Michalak's death. We therefore determine the Kaletas' remainder interest was vested, rather than contingent as Zagorski argues. A remainder is contingent if the remainderman's identity cannot be definitely ascertained or if the remainder is conditioned on the happening of an event not certain to happen. *Oak Park Trust & Savings Bank v. Baumann*, 108 Ill. App. 3d 322, 328, 438 N.E.2d 1354, 1358 (1982); *Dempsey v. Dempsey*, 342 Ill. App. 3d 969, 974, 795 N.E.2d 996, 1000 (2003). A "vested remainder is to one ready to come into possession upon the termination of the prior estate." (Emphasis omitted..) *Jurgens v. Eads*, 67 Ill. App. 3d 52, 57, 383 N.E.2d 1003, 1006 (1978).

Here, we perceive that Zagorski's argument patently overlooks the absence of any condition precedent to the Kaletas acquiring an interest in the real estate upon execution of the

11

trust. Their enjoyment of the property would immediately materialize upon Michalak's death, subject to no other conditions. See *In re Estate of Zukerman*, 218 Ill. App. 3d at 332, 578 N.E.2d at 253 (beneficiary's interest in trust property vested immediately upon declaration of trust, although she was not to receive possession of property until settlor's death); *Giagnorio v. Torkelson Trust*, 292 Ill. App. 3d 318, 324, 686 N.E.2d 42, 46 (1997) (contingent beneficiary of a current, existing, trust had standing to pursue a suit against the trustee for breach of fiduciary duties). *Cf. Schlosser v. Schlosser*, 247 Ill. App. 3d 1044, 1049-50, 618 N.E.2d, 364-65 (1993) (grandchildren lacked standing to contest validity of subsequent will which revoked trust where trust provided for beneficial interest to pass to the grandchildren "then living," who were thus contingent, rather than vested, remainders, and where approval by the trustee was a condition precedent). Conversely, in the case *sub judice*, the Kaletas had an equitable remainder interest, which vested immediately upon the creation of the trust and, therefore, they have standing to appeal the circuit court's order.

We now address the merits of the Kaletas' grounds for appeal. The Kaletas first maintain that Zagorski's petition to amend the trust is not permitted by section 11a-18(a-5)(11) of the Probate Act (755 ILCS ILCS 5/11a-18(a-5)(11) (West 2008)), which prescribes the duties of the estate guardian. The construction of a statute, including section 11a-18(a-5)(11) of the Probate Act, is a question of law, which this court reviews *de novo*. *In re Estate of Ahmed*, 322 Ill. App. 3d 741, 744, 750 N.E.2d 278, 281 (2001). "A court must consider all of the parts of the statute together." *People v. Martinez*, 184 Ill. 2d 547, 550, 705 N.E.2d 65, 66 (1998), citing *People v. Warren*, 173 Ill. 2d 348, 357, 671 N.E.2d 700, 705 (1996).

1-09-0976

The Kaletas assert that the plain language of subsection 11a-18(a-5)(11) demonstrates a clear legislative intent to allow amendment of revocable trusts only to adjust to changes in tax laws. Conversely, Zagorski maintains that the meaning of subsection 11a-18(a-5)(11) must be gleaned from the plain language of section 11a-18(a-5) as a whole and that this subsection does not limit amendment of trusts to only tax purposes.

We are mindful of the parties' arguments as to the legislative intent in the passage of section 11a-18, with citation to the legislative debates. However, where a statute is clear and unambiguous, the court should not look to extrinsic aids for construction. *Lawrence v. Regent Realty Group*, 197 Ill. 2d 1, 10, 754 N.E.2d 334, 339 (2001), citing *Board of Education of Rockford School District No. 205 v. Illinois Educational Labor Relations Board,* 165 Ill. 2d 80, 87, 649 N.E.2d 369, 372 (1995). Section 11a-18(a-5) clearly states:

"In ascertaining and carrying out the ward's wishes the court *may* consider, *but shall not be limited to*, minimization of State or federal income, estate, or inheritance taxes; and providing gifts to charities, relatives, and friends that would be likely recipients of donations from the ward. The ward's wishes as best they can be ascertained shall be carried out, whether or not tax savings are involved." (Emphasis added.) 755 ILCS 5/11a-18(a-5) (West 2008).

Subsection 11a-18(a-5)(11) is also permissive:

"Actions or applications of funds *may* include, but shall not be limited to, the following:

* * *

(11) modifying by means of codicil or trust amendment the terms of the ward's

13

will or any revocable trust created by the ward, as the court *may* consider advisable in light of changes in applicable tax laws." (Emphasis added.) 755 ILCS 5/11a-18(a-5)(11) (West 2008).

" 'Under the well established rules of statutory construction, the words used in the statute must be given their ordinary and popularly understood meaning, and the relevant language must be read within the context of the entire provision of which it forms an integral part.' " *Garner v. City of Chicago*, 319 Ill. App. 3d 255, 263, 744 N.E.2d 867, 872 (2001), quoting *Illinois Wood Energy Partners, L.P. v. County of Cook*, 281 Ill. App. 3d 841, 850, 667 N.E.2d 477, 483 (1995). "The words 'include' [and] 'including' are ordinarily terms of enlargement rather than restriction and indicate that items enumerated in statute are not meant to be exclusive." *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 286 Ill. App. 3d 660, 667, 676 N.E.2d 1016, 1021 (1996), citing *Paxson v. Board of Education of School District No. 87*, 276 Ill. App. 3d 912, 920, 658 N.E.2d 1309, 1314 (1995).

Notably, in *In re Estate of Ahmed*, we held that "[t]he consistent and exclusive use of the term 'may' throughout section 11a-18(a-5)" indicated that the provision was permissive, and that the trial court may exercise its discretion in granting relief under it. *In re Estate of Ahmed*, 322 Ill. App. 3d at 746, 750 N.E.2d at 281. The trust company had argued that moving the assets of the ward's guardianship estate into a trust would yield higher returns than in a guardianship account, and would allow "more flexibility in the administration of [the ward's] assets." *In re Estate of Ahmed*, 322 Ill. App. 3d at 742, 750 N.E.2d at 279. Instead, the trial court found that, regardless of the potential higher return, it was in the best interest of the disabled person to leave

14

his funds within the protection of the guardianship estate, pursuant to the legislative intent to protect wards. *In re Estate of Ahmed*, 322 Ill. App. 3d at 743-44, 750 N.E.2d at 280. We found the language of the statute was clearly permissive and not mandatory, and we affirmed the trial court's denial of the trust company's petition to transfer the guardianship estate to a trust as a proper exercise of its discretion under the enactment. *In re Estate of Ahmed*, 322 Ill. App. 3d at 747, 750 N.E.2d at 282.

Although the Kaletas implicitly concede "the clearly permissive language in the statute" (section 11a-18(a-5)), they nonetheless contend that subsection 11a-18(a-5)(11) is restrictive in its scope. Based on the plain language of the statute, we disagree and find that subsection (11) does not restrict the broad permissive language of section 11a-18(a-5), of which it is a part.

The Kaletas further argue that section 11a-18(d), which provides that "[a] guardian of the estate shall have no authority to revoke a trust that is revocable by the ward," demonstrates the legislature's intent to protect estate planning vehicles such as trusts from amendment after a ward has been declared disabled. 755 ILCS 5/11a-18(d) (West 2008). However, this provision is limited to guardians of the estate, and does not prohibit guardians *ad litem* from petitioning to revoke or amend trusts on behalf of a ward. The trial court had the authority, pursuant to 11a-18(a-5), and particularly subsection 11a-18(a-5)(11), to grant Zagorski, as plenary guardian of Michalak's estate, the power to amend the terms of the trust, especially given the court's finding that it was not the ward's wish that they be the beneficiaries. 755 ILCS 5/11a-18(a-5) (West 2008).

The Kaletas next maintain that the trial court improperly reappointed Horan as guardian

15

*ad litem*, that Horan inappropriately exercised her office as guardian *ad litem*, and the court improperly relied on inadmissible hearsay provided by Horan in her report. The role of the guardian *ad litem* is set out in section 11a-10 of the Probate Act. *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 88, 666 N.E.2d 16, 23 (1996). Section 11a-10(a) provides, in relevant part:

"The court shall appoint a guardian ad litem to report to the court concerning the respondent's best interests consistent with the provisions of this Section *** at or before the hearing, the guardian ad litem shall file a written report detailing his or her observations of the respondent, the responses of the respondent to any of the inquires detailed in this Section, the opinion of the guardian ad litem or other professionals with whom the guardian ad litem consulted concerning the appropriateness of guardianship, and *any other material issue* discovered by the guardian ad litem. The guardian ad litem shall appear at the hearing *and testify as to any issues presented in his or her report*. (Emphasis added.)" 755 ILCS 5/11a-10(a) (West 2008).

The Kaletas also fault Horan's supplemental reports, characterizing them as an improper exercise of her office. However, under the statute we discern no impropriety. Pursuant to section 11a-17(b), a guardian *ad litem* is specifically authorized to file periodic reports with the court, and again allows for a broad scope of information to be presented to the court:

"If the court directs, the guardian of the person shall file with the court at intervals indicated by the court, a report that shall state briefly: (1) the current mental, physical, and social condition of the ward *** ; *** (4) a resume of the guardian's visits with and activities on behalf of the ward ***; (5) a recommendation as to the need for continued

16

guardianship; (6) *any other information requested by the court or useful in the opinion of the guardian*." (Emphasis added.) 755 ILCS 5/11a-17(b) (West 2008).

Section 11a-17 vests a guardian *ad litem* with broad authority to act in the best interest of the ward. *In re Estate of D.W.*, 134 Ill. App. 3d 788, 791, 481 N.E.2d 355, 356-57 (1985).

Similarly, the Kaletas' assertion that the reappointment of Horan as guardian *ad litem* was improper finds no support in the statute. Section 11a-18(c) expressly states a court's power to appoint a guardian *ad litem* is not limited:

"The guardian of the estate of a ward shall appear for and represent the ward in all legal proceedings unless another person is appointed for that purpose as guardian or next friend. This does not impair the power of any court to appoint a guardian ad litem or next friend to defend the interests of the ward in that court, or to appoint or allow any person as the next friend of a ward to commence, prosecute or defend any proceeding in his behalf." 755 ILCS 5/11a-18(c) (West 2008).

This provision comports with our prior decisions holding that in addition to the guardian of the estate a guardian *ad litem* may be appointed to represent the interests of the disabled person and is specifically authorized " 'to defend the interests of the ward in *** court.' " *In re Marriage of Hirsch*, 135 Ill. App. 3d 945, 960, 482 N.E.2d 625, 635 (1985), quoting Ill. Rev. Stat. 1983, ch. 110-111, par. 11a-18.. The Kaletas argue that this language "does not authorize ***, nor does it suggest, that appointment of a guardian *ad litem* in an action pursuant to [s]ection 11a-18(a-5) is appropriate or necessary," but offer no authority for finding such appointment unauthorized or improper. We find the language of section 11a-18(c) is sufficiently

17

broad on its face, allowing the appointment of a guardian *ad litem* to "commence, prosecute or defend *any proceeding*" on a ward's behalf. (Emphasis added.) 755 ILCS 5/11a-18(c) (West 2008).

We next consider the Kaletas' argument that the trial court erroneously denied them oral discovery and improperly denied their request for leave to file an answer to Zagorski's petition within the time frame provided by law. In the proceedings below, the Kaletas noticed the depositions of Zagorski for August 21, 2008, and of Michalak for August 22, 2008, although trial was set to begin on August 28, 2008, and sought to file a late answer.

Supreme Court Rule 202 provides: "If the evidence deposition of a witness is to be taken within 21 days of trial, a discovery deposition is not permitted unless the parties stipulate otherwise or the court orders otherwise upon notice and motion." 166 Ill. 2d R. 202. Supreme Court Rule 183 provides that a court, "for good cause shown" on motion with notice to the opposite party, may extend the time for filing any pleading. 134 Ill. 2d R. 183. Here, the Kaletas sought to take depositions six and seven days before trial, in clear contravention of Supreme Court Rule 202. The Kaletas' answer was due July 31, 2008, and as Zagorski cogently argues, the record does not show that the Kaletas articulated sufficient cause for seeking to file a belated response. The Kaletas make no reply to these assertions, thereby tacitly admitting them.

We affirm the court's order of August 21, 2008, quashing the deposition subpoenas and denying the Kaletas leave to file their answer *instanter*. In so ruling, we discern the Kaletas' cited authorities are distinguishable. *People v. Williford*, 271 Ill. App. 3d 922, 649 N.E.2d 941 (1995), is a criminal case governed by the attendant discovery rules for criminal cases, and there

the discovery request at issue consisted of a single interrogatory which was not unduly burdensome and was timely filed and served. *Williford*, 271 Ill. App. 3d at 928, 649 N.E.2d at 945. *Krych v. Birnbaum*, 66 Ill. App. 3d 469, 384 N.E.2d 52 (1978), was a shareholder suit against a corporation for declaratory relief, including an accounting and dissolution of the corporation. Moreover, in *Krych*, good cause was shown where both parties had engaged in discovery and the reply sought to be filed was in response to a motion for judgment on the pleadings filed on the day of trial, with no prior notice. *Krych*, 66 Ill. App. 3d at 471, 384 N.E.2d at 54. Thus, good cause was shown. Here, the Kaletas made no such showing.

Further, section 1-4 of the Probate Act provides: "On the court's own motion or on motion of any interested person, before or during any hearing, any person who desires to oppose the entry of an order or judgment shall file, *as directed by the court*, a pleading disclosing the grounds of opposition." (Emphasis added.) 755 ILCS 5/1-4 (West 2008).

Additionally, we perceive that the court below may have statutory authority to enter an order without the requirement of a response or further discovery. Section 11a-18(f) provides:

"Upon petition by any interested person (including the standby or short-term guardian), with such notice to interested persons as the court directs and a finding by the court that it is in the best interest of the disabled person, the court may terminate or limit the authority of a standby or short-term guardian or *may enter such other orders as the court deems necessary to provide for the best interest of the disabled person*." (Emphasis added.) 755 ILCS 5/11a-18(f) (West 2008).

The Kaletas also contend that they were denied the "right to cross examine" Horan, citing

19

only one authority, *Alford v. United States*, 282 U.S. 687, 75 L. Ed. 624, 51 S. Ct. 218 (1931), a criminal case. To the extent the Kaletas are referring to the sixth amendment confrontation clause, we find such argument misplaced, as the guarantee is a protection afforded to criminal defendants. The sixth amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const, Amend. VI. This valuable safeguard protects a criminal defendant's right of cross-examination. *People v. Alcala*, 248 Ill. App. 3d 411, 422, 618 N.E.2d 497, 505 (1993), citing *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110 (1974).[1] The constitutional right to confront witnesses and the common law right are separate. *People v. Averhart*, 311 Ill. App. 3d 492, 497, 724 N.E.2d 154, 159 (1999).

Although the Kaletas initially argue that they were denied a fair trial because the trial court denied their right to cross-examine, it is apparent from the remainder of their argument and the record that their complaint actually addresses the scope of the examination. The Kaletas assert that the trial court should have allowed them to cross-examine Horan regarding her place of work and residence, her language skills, and an unidentified "competent and probative question submitted to her." Yet, the Kaletas offer no insight as to how barring such questions resulted in any prejudice to them. Given the paucity of argument and authority on this point, we have no difficulty in finding they have forfeited addressing the merits of same.

---

[1] This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). *Davis*, 415 U.S. at 315, 39 L. Ed. 2d at 353, 94 S. Ct. at 1110.

Further, even were we to reach the issue, the scope and extent of cross-examination are within the discretion of the trial court. *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 998, 874 N.E.2d 100, 109 (2007). When a party challenges a trial court's evidentiary rulings, the standard of review is abuse of discretion. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92, 658 N.E.2d 450, 454-55 (1995). It is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere. *Adams*, 369 Ill. App. 3d at 998, 874 N.E.2d at 109. Even errors of a constitutional dimension, such as the right of confrontation, may be harmless. *In re Marriage of De Bates*, 212 Ill. 2d 489, 515, 819 N.E.2d 714, 728 (2004). As the Kaletas make no showing of manifest prejudice to them, there was no abuse of discretion in the trial court's rulings circumscribing cross-examination.

Moreover, in addressing the Kaletas' evidentiary arguments, we perceive that hearings concerning issues implicating the welfare and best interests of a disabled person are not in the nature of an adversarial proceeding, as other civil proceedings are. See *In re Estate of Wellman*, 174 Ill. 2d 335, 347-48, 673 N.E.2d 272, 278 (1996) ("guardianship proceedings are not, strictly speaking, adversarial"). "A guardian *ad litem* functions as the 'eyes and ears of the court' and not as the ward's attorney." *In re Mark W.*, 228 Ill. 2d 365, 374, 888 N.E.2d 15, 20 (2008), quoting *In re Guardianship of Mabry*, 281 Ill. App. 3d at 88, 666 N.E.2d at 24, citing *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 415-16, 639 N.E.2d 897, 904 (1994). "The GAL does not represent the ward in a normal attorney-client relationship; in fact, the GAL need not even be an attorney." *In re Guardianship of Mabry*, 281 Ill. App. 3d at 89, 666 N.E.2d at 24, citing 755

21

1-09-0976

ILCS 5/11a-10(a) (West 1994).

Further, a guardian *ad litem* is an officer of the court; "[g]uardians only act as the hand of the court and are at all times subject to its direction in the manner in which they provide for the care and support of the disabled person." *In re Estate of Nelson*, 250 Ill. App. 3d 282, 287, 621 N.E.2d 81, 85 (1993), *appeal denied*, 152 Ill. 2d 560, 622 N.E.2d 1207 (1993), citing *In re Estate of Peterson*, 103 Ill. App. 3d 481, 485-86, 431 N.E.2d 748, 752 (1982). "Once a person is adjudicated disabled, that person remains under the jurisdiction of the court, even when a plenary guardian of the person has been appointed." *In re Mark W.*, 228 Ill. 2d at 375, 888 N.E.2d at 21, citing *In re Estate of Nelson*, 250 Ill. App. 3d at 286-87, 621 N.E.2d at 84-85. Moreover, a disabled person is viewed as " 'a favored person in the eyes of the law' " and is entitled to vigilant protection. *In re Mark W.*, 228 Ill. 2d at 374-75, 888 N.E.2d at 20, quoting *Wellman*, 174 Ill. 2d at 348, 673 N.E.2d at 278. The Kaletas acknowledge *In re Mark W.*, but offer no substantive response, other than repeating their own circular argument. The legislature has specifically delineated the nature and conduct of these proceedings in the myriad provisions we have recited, and we find no impropriety in the conduct of the proceedings below.

The Kaletas further maintain that the court should not have allowed the admission of certain hearsay statements appearing in Horan's report and that the court should not have considered these statements in ruling on the petition. The Kaletas particularly challenge Horan's February 13, 2008, "Gifting Report" as the most problematic, containing statements of the ward, Robert Kaleta, attorney John Kuranty, police officer Jane Fudacz, a bank employee, a family services employee, and Michalak's friends Ann Beres and Jean Kinsinger. Although the

22

admission of evidence is ordinarily within the sound discretion of the trial court, the initial determination that a particular statement constitutes hearsay is a legal issue, which does not require any exercise of discretion, fact finding or evaluation of credibility. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 891, 647 N.E.2d 618, 623 (1995). Thus, a trial court's determination as to the hearsay nature of a particular statement is subject to a *de novo* standard of review. *Halleck*, 269 Ill. App. 3d at 891, 647 N.E.2d at 623. .

At the outset, we note that the Kaletas fail to identify the statements they find problematic (see *In re Marriage of De Bates*, 212 Ill. 2d at 517, 819 N.E.2d at 729 (argument that a report was improperly admitted where it was "riddled with hearsay," was forfeited where respondent did not identify the purported hearsay statements and did not describe any prejudicial effect resulting from the report's admission)). However, the Kaletas do refer to the parties who made such statements, including police officers and Michalak's neighbors, and they do claim prejudicial effect, thereby sufficiently preserving the issue for our review.

Hearsay is " 'testimony in court or written evidence, of a statement made out of court, *** offered to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963), quoting McCormick on Evidence section 225, at 460 (1954). Generally, hearsay is inadmissible unless it falls within a recognized exception. *In re A.J.*, 296 Ill. App. 3d 903, 916, 695 N.E.2d 551, 560 (1998). We recognize that hearsay statements have been excluded in a proceeding to terminate parental rights. See *In re A.J.*, 296 Ill. App. 3d at 917, 695 N.E.2d at 560 (reversing judgment of circuit court which had allowed admission of hearsay of

caseworkers that respondent had positive drug tests). However, we find no authority in Illinois mandating the exclusion of relevant information in a guardian *ad litem*'s report concerning issues regarding a ward being investigated by a court. On the contrary, it appears that hearsay is considered in making such investigations and determinations. See *In re Estate of Nelson*, 250 Ill. App. 3d at 287-88, 621 N.E.2d at 85 (when court was presented with hearsay information indicating that ward might be neglected, prudent course was to investigate adult ward's living conditions to verify such information). See also *In re Estate of Steinfeld*, 158 Ill. 2d 1, 12, 630 N.E.2d 801, 806 (1994) (court rejected a contention that reliance on hearsay statements, the absence of a medical report, and the disregard of several other statutory requirements violated constitutional rights and rendered a disability and guardianship order void).

Nevertheless, we are mindful that the Code of Civil Procedure (735 ILCS 5/1-101 *et seq.*) applies, with certain exceptions, to all proceedings under the Probate Act. 755 ILCS 5/1-6 (West 2008); *In re Estate of Barth*, 181 Ill. App. 3d 279, 282, 536 N.E.2d 973, 975 (1989). The Code provides: "As to all matters *not* regulated by statute or rule of court, the practice at common law prevails." (Emphasis added.) 735 ILCS 5/1-108(c) (West 2008). Notably, according to section 11a-10 (755 ILCS 5/11a-10(a) (West 2008)) of the Probate Act, "[t]he guardian ad litem *shall* appear at the hearing and testify as to *any issues presented in his or her report*." (Emphasis added.) *In re Estate of Doyle*, 362 Ill. App. 3d 293, 301, 838 N.E.2d 355, 362 (2006). However, the probate court does not have a provision in derogation of the common law rule proscribing hearsay testimony.

Although the Kaletas acknowledge the breadth of section 11a-10(a), they stridently

maintain that there is nothing in the Probate Act, including section 11(a)-10(a) that immunizes the contents of the report or the testimony of the guardian *ad litem* from the rules of evidence. Noting the lack of definitive Illinois precedent addressing this issue, the Kaletas seek reliance on *Joyce S. v. Frank S.*, 6 Neb. App. 23, 571 N.W.2d 801 (1997), where the Nebraska Court of Appeals observed :

> "[t]he primary function of the guardian ad litem's report is for the guardian to demonstrate to the judge that the guardian has performed his or her duty. Frequently, when a guardian ad litem's report does not contain objectionable hearsay, it is an efficient means of communicating the facts that the guardian has learned to the parties and to the judge, if properly admitted into evidence, but a report is not somehow made admissible because it was prepared by a guardian ad litem appointed by a court pursuant to a statute. Hearsay within such reports remains hearsay. The guardian's report and the documents attached to it will not be considered in our de novo review." *Joyce S.*, 6 Neb. App. at 33, 571 N.W.2d at 809.

An identical result obtained in *In re Guardianship of R.S.*, 162 Wis. 2d 197, 470 N.W.2d 260 (1991), where the circuit court admitted the hearsay report of a licensed psychologist as evidence of her diagnosis of the proposed ward's incompetence. Although the Wisconsin Supreme Court recognized that by statute the psychologist's report could be furnished to the court, it rejected the contention that the legislature intended that the substance of the report could be admitted into evidence at trial. *In re Guardianship of R.S.*, 162 Wis. 2d at 207, 470 N.W.2d at 264. Similarly, in Florida, although the law mandated that the guardian *ad litem* file a written

report with the court, that requirement did not serve to admit the contents as proof of the matters asserted. *Scaringe v. Penni Herrick*, 711 So. 2d 204 (Fla. App. 1998). As the Florida Court of Appeals reasoned:

> "By necessity, the report will usually contain hearsay. The act of filing the report does not place the report in evidence. Hearsay rules contained in the Florida Evidence Code apply to section 61.403. Accordingly, when a guardian attempts to testify to hearsay statements and a valid hearsay objection is raised, that objection should be sustained." *Scaringe*, 711 So. 2d at 204-05.

Likewise, in Tennessee although a guardian *ad litem*'s report is not admissible evidence, such reports may be reviewed by the trial court to provide an overview of the evidence and to allow the court to determine which of the issues are contested. *Toms v. Toms*, 98 S.W.3d 140 (Tenn. 2003). However, a guardian may not testify as to statements made by witnesses who were interviewed in the course of the guardian's investigation, unless the statement does not meet the definition of hearsay or a hearsay exception governs the testimony. *Toms*, 98 S.W.3d at 144.

In the case *sub judice* the trial court did not squarely address the Kaletas' hearsay objection, instead ruling that, it could take judicial notice "of any pleading in the case *** or any report that's been filed."[2] The court then proceeded to admit the report as evidence, and

---

[2] The doctrine of judicial notice is a substitute for proof and is based on convenience and necessity. Taking judicial notice of a fact is merely another way of saying that the usual forms of evidence will be dispensed with if the fact is one which is commonly known or readily verifiable from sources of indisputable accuracy. J. Corkery, Illinois Civil, Criminal Evidence § 201.101

considered its entirety and the statements therein in making her ruling. However, the court did find that some of the extrajudicial statements in the report were not offered to show the truth of the matter asserted therein.

Our *de novo* review offers some support for the trial court's findings. Out-of-court statements offered for some independent purpose, rather than the truth of the matter asserted, are not hearsay. *Lauman v. Vandalia Bus Lines, Inc.*, 288 Ill. App. 3d 1063, 1072, 681 N.E.2d 1055, 1062 (1997); *Halleck*, 269 Ill. App. 3d at 891, 647 N.E.2d at 623. See, *In re Estate of Berry*, 277 Ill. App. 3d 1088, 1093, 661 N.E.2d 1150, 1154 (1996) (averments of affidavit that defendant knowingly provided false information to decedent to induce her to change her will were not offered for their truth, but rather for their falsity); *People v. Quick*, 236 Ill. App. 3d 446, 452, 603 N.E.2d 53, 58 (1992) (hearsay exception permits out-of-court statements to prove a declarant's state of mind, emotions or sensation when state of mind is at issue). The rationale for this exception is based on need, particularly when a declarant has died or become mentally incompetent and the declarant's statement is the only direct evidence of the his intent. 4 C.. Fishman, Jones on Evidence § 29:24 (7th ed. 2000).

In her so-called "Gifting Report," Horan first identifies the issues under consideration, namely: (1) whether the ward understood the documents she signed on November 6, 2006; (2)

---

(2000), citing *People v. Speight*, 222 Ill. App. 3d 766, 771, 584 N.E.2d 392, 396-98 (1991). Although a court may take judicial notice of matters of record in its own proceeding, this cannot result in admitting hearsay evidence where it would otherwise be prohibited. *In re A.B.*, 308 Ill. App. 3d 227, 237, 719 N.E.2d 348, 356 (1999).

whether the ward had the mental capacity to gift her residence; and (3) whether the ward was unduly influenced by the recipient so as to invalidate the gift. Horan next reviews the statements attributed to the various persons interviewed. Police officer Fudacz, who met with Michalak on January 30, 2007, reported Michalak's confusion regarding the power of attorney she purportedly had signed. Similarly, Bernadette Baran's statements highlighted Michalak's confusion when she attempted to add Bonnie Huff as a beneficiary on her Prospect Bank accounts in May 2007. Tracey Fondren, the social worker who visited Michalak on February 9, 2007, one month after the ward was told of Huff's efforts to withdraw funds from her accounts noted Michalak nonetheless was unaware of anyone making such attempts. Additionally, Jean Kinsinger informed Horan that in June or July 2007, the ward was confused and could not remember what she had said a couple of minutes earlier. We discern that none of these statements were offered to prove the truth of the matters asserted, but rather Michalak's mental capacity to gift her residence to the Kaletas. Conversely, we find other declarations were indeed offered for a hearsay purpose. For example, Michalak's statements to Horan that Robert was the one signing all the papers because he thought he was going to get the home, but instead she wanted it to go to Zagorskis'. Likewise, statements attributed to John Kuranty that Michalak told him that neighbors who wanted her to sign her house over to them were falsely calling themselves cousins were offered to prove the truth of the assertion .

Further, even if one were to disagree and find that the third-party statements in Horan's report were hearsay, the erroneous admission of hearsay is not grounds for reversal where there is sufficient competent evidence to support the decision. *Blount v. Stroud*, 395 Ill. App. 3d 8, 37,

915 N.E.2d 925, 951 (2009). Although the Kaletas assert that the entirety of Horan's report consisted of hearsay, that notion is dispelled by our review of the report. Here, apart from the recitals of the report, the trial court relied on the testimony of both guardians, notwithstanding the adverse testimony offered by the Kaletas and Attorney Kurranty. See, *e.g.*, *Anderson v. Alberto-Culver USA, Inc.*, 337 Ill. App. 3d 643, 668, 789 N.E.2d 304, 323 (2003) (although report prepared by the National Transportation Safety Board was improperly admitted into evidence, the error was harmless where there was ample other evidence in the record to support the jury's verdict).

We next address the Kaletas' contention that the trial court's findings that (a) it was able to ascertain the present desires of the ward, and (b) the ward desired to substitute the guardian in lieu of the Kaletas as the successor trustee and beneficiary were against the manifest weight of the evidence. Although the Kaletas maintain that Zagorski was required to establish her proof by clear and convincing evidence, we find the authorities relied upon are inapposite. *In re Estate of Greenspan*, 137 Ill. 2d 1, 24, 558 N.E.2d 1194, 1205 (1990), cited by the Kaletas, held that the guardian's right to discontinue artificial feeding and hydration required clear and convincing evidence of the ward's intent. *In re Estate of Austwick*, 275 Ill. App. 3d 769, 775, 656 N.E.2d 779, 784 (1995), involved a ward's desire to receive anticonvulsive therapy under a statute that expressly stated the burden to be clear and convincing evidence. As we are not presented here with any decisions to withdraw life-sustaining treatment or to invoke extraordinary mental health measures, a clear and convincing standard of proof would be inappropriate. Instead, we conclude that Zagorski had the burden of establishing the allegations of her petition by a preponderance of

the evidence. *Northwestern University v. McLoraine*, 108 Ill. App. 3d 310, 321, 438 N.E.2d 1369, 1376 (1982).

Moreover, our precedent instructs that we review the trial court's judgment under the manifest weight of the evidence standard. See *In re Estate of Vail*, 309 Ill. App. 3d 435, 438, 722 N.E. 2d 248, 251 (1999) ("In reviewing a probate court's determination, all reasonable presumptions are made in favor of the trial court, the appellant has the burden to affirmatively show the errors alleged, and the judgment will not be reversed unless the findings are clearly and palpably contrary to the manifest weight of the evidence"). A trial court's ruling is against the manifest weight of the evidence only if it is unreasonable, arbitrary and not based on the evidence, or when the opposite conclusion is clearly evident from the record. *In re Estate of Savio*, 388 Ill. App. 3d 242, 247, 902 N.E.2d 1113, 1118 (2009), citing *Smith v. Marvin*, 377 Ill. App. 3d 562, 569, 880 N.E.2d 1023, 1030 (2007). Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses. *In re D.F.*, 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002). "A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to given to the evidence, or the inferences to be drawn." *In re D.F.*, 201 Ill. 2d at 499, 777 N.E.2d at 943.

As noted, Horan's report assumed the issues to be addressed in the hearing on Zagorski's petition were whether Michalak, on November 6, 2006, had the mental capacity to make a gift and execute legal documents and whether Michalak was unduly influenced by the recipients so as to invalidate the gift. Yet, the trial court rejected Horan's assumptions, "that is not what we are

here to determine," and instead focused on the guardian's request to amend the trust:

> "We are here to determine whether or not the guardian now has the authority to request of this court, and the court thinks there is a reason for changing certain conditions or terms of the trust. Number one being who is the successor trustee. Also number two, who takes upon the death."

Recognizing that Zagorski's petition was presented pursuant to section 11(a)-18(a-5) of the Act (755 ILCS 5/11(a)-18(a-5) (West 2008)), the court correctly observed that even though a guardian is in place, the ward may retain decisionable capacity and has the basic right to offer preferences to which the court is required to give substantial weight. The court recognized that the section vested the guardian with the right to amend a trust, with the proviso that the "guardian shall also indicate in the petition any planned disposition is consistent with the intention of the ward insofar as they can be ascertained."

Based essentially on the testimony of Zagorski and Horan, the court determined that Michalak did not want the Kaletas to get her home. While observing that Zagorski had had limited contact with her aunt over the years, the court nonetheless found her testimony to be credible. The court noted Zagorski's response to the bank when questions arose concerning Michalak's account and that upon finding Michalak's house to be in disarray in May 2007 she acted appropriately by bringing her aunt to her home. The court further credited statements attributed to the ward in Horan's report that she did not want her house to go to Robert "no more," that he was "a little crook," and instead wanted her house to go to her niece and her husband, Jackie and Ken Zagorski. In assessing the Kaletas' testimony, the court found

questionable the assertion that they continued to visit Michalak three to four times a week after moving in 2003. The court also found "unusual" Jolanta Kaleta's denial that Michalak drove, given Kuranty's testimony that Michalak had presented a driver's license at their meeting. Although the court referred to other individuals mentioned in Horan's report, those references did not address Michalak's dispositive wishes concerning her trust.

The Kaletas nonetheless assert that the trial judge overlooked contrary evidence supporting Michalak's original intention to gift her home to them. The Kaletas maintain that the only evidence introduced at trial indicated that they had been "exceedingly good to Ms. Michalak." In challenging the statement attributed to Michalak that Robert Kaleta was a "little crook," they argue that no fact finder should have taken the ward's comment at face value given the testimony that the ward was then struggling to even remember Robert Kaleta. The Kaletas likewise submit that no testimony was presented suggesting that Robert warranted that description. Additionally, while recognizing that the trial court's ruling was prefaced on the notion that an adjudicated ward can still offer a dispositional preference, the court ignored evidence that as of June 15, 2007, prior to any inquiry from Horan, Dr. Ibrahimi found Michalak to be totally "incapable of making personal or financial decisions."

Notwithstanding the foregoing observations, we find that the trial court conducted a meaningful review of the evidence and made appropriate determinations regarding the credibility of the witnesses, the weight to be given to the evidence and the inferences to be drawn therefrom. Although the court did rely in part on hearsay present in various reports, there was sufficient competent evidence to support the decision rendered. We therefore conclude that the court's

32

findings and judgment were not against the manifest weight of the evidence.

Lastly, the Kaletas maintain that the circuit court erred in entering an order approving a reverse mortgage on Michalak's property in trust, arguing that once notice of appeal was filed the circuit court was divested of jurisdiction to enter the order. In support of the proposition that upon the filing of a notice of appeal, a circuit court is divested of jurisdiction to enter any orders involving a matter of substance and retains jurisdiction only for matters independent of and collateral to a judgment, the Kaletas cite to *Wierzbicki v. Gleason*, 388 Ill. App. 3d 921, 906 N.E.2d 7 (2009). In *Wierzbicki*, we held that the circuit court lost jurisdiction after defendants filed a notice of appeal from the court's order reinstating the case after a dismissal for want of prosecution and all proceedings were stayed pending the resolution of that appeal. However, due to the conduct of plaintiff's counsel in asking the clerk of the circuit court to delete an order, the court subsequently entered an order dismissing the plaintiff's case. The plaintiff filed a notice of appeal challenging that ruling as well. We held that the later order of the circuit court was void and ordered it vacated. *Wierzbicki*, 388 Ill. App. 3d at 931, 906 N.E.2d at 17.

Without further argument or citation, the Kaletas assert that the encumbrance of the property is not independent of or collateral to the judgment entered here. Zagorski argues the subsequent order granting a reverse mortgage addresses Michalak's own use of her beneficial interest in the property, which was not the issue decided in this case. Both parties further make references to purported facts without citation to the record in contravention of Supreme Court Rule 341(e)(6) (188 Ill. 2d R. 341(e)(6)) and to procedural matters not of record before us occurring after the notice of appeal has been filed, without seeking our leave to supplement the

record upon motion supported by affidavit under Supreme Court Rule 362 (155 Ill. 2d R. 362(a), (b)). We point out to both parties that "the rules promulgated by the supreme court are, in fact, rules, and not advisory suggestions for conduct of the lower courts and the bar." *Roberson v. Liu*, 198 Ill. App. 3d 332, 335, 555 N.E.2d 999, 1001 (1990) citing *People v. Wilk*, 124 Ill. 2d 93, 103, 529 N.E.2d 218, 221 (1988).

Supreme Court Rule 305(b) provides that a circuit court "may" stay the enforcement of a nonmoney judgment. 210 Ill. 2d. R. 305(b). The power to grant stays is discretionary. *Horvath v. Loesch*, 87 Ill. App. 3d 615, 620, 410 N.E.2d 154, 158 (1980), citing *City of Chicago v. Cosmopolitan National Bank*, 77 Ill. App. 3d 212, 220, 395 N.E.2d 1070, 1075 (1979). Orders entered by a trial court after the filing of a notice of appeal are valid if substantive issues on appeal are not affected and if the nature of the appeal is not altered. *Homeowners Organized to Protect the Environment, Inc. v. First National Bank of Barrington*, 167 Ill. App. 3d 714, 720, 521 N.E.2d 1202, 1206 (1988). Here, the judgment below determined the status of the Kaletas' prior interest, where they were merely successor beneficiaries as remaindermen of Michalak's trust. Michalak remained the primary beneficiary of her trust, and any action taken with respect to her interest does not affect the Kaletas' issues on appeal. Thus, the trial court did not abuse its discretion in denying the stay.

CONCLUSION

For the foregoing reasons, we affirm, the order of the circuit court amending Bozena Michalak's revocable trust and denying the stay of the court's judgment.

Affirmed.

1-09-0976

HOWSE and LAVIN, JJ., concur.