# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Rivera*, 2018 IL App (1st) 171214

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF INEZ RIVERA, a Disabled Adult (The Northern Trust Company, as Both Plenary Guardian of the Estate of Inez Rivera, a Disabled Adult, and Trustee of the Inez Rivera Trust, Petitioner-Appellee; Jennifer M. Vega, as Plenary Guardian of the Person of Inez Rivera, a Disabled Adult, Respondent-Appellee; and Martin A. Rivera and All of His Descendants Other Than Jazlyn Rivera, Respondents-Appellants). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-1214 |
| Filed | June 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-P-000438; the Hon. Caroline G. Quinn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Linda S. Kagan, of Chicago, for appellants.<br><br>Celeste E. Kralovec and Lynne M. Kralovec, of Kralovec Law Group LLC, of Chicago, for appellee the Northern Trust Company.<br><br>Paul S. Franciszkowicz and Kathryn T. McCarty, of FMS Law Group LLC, of Chicago, for other appellee. |

| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. |
|---|---|
| | Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1 Martin A. Rivera and 8 of his 11 children appeal from a trial court order authorizing an amendment to the estate plan of his third daughter, 23-year-old Inez Yolanda Rivera, who is permanently and profoundly disabled by birth injuries. Inez's estate is sizeable after her receipt of a $12 million personal injury settlement in 2003. Because of her physical and cognitive delays, Inez has never married, has not had or adopted children, and has never had testamentary capacity. Inez's initial estate plan followed the rules of intestacy and benefitted both parents and all full- and half-siblings in equal shares, but after a "best interests" hearing pursuant to *Howell*, the trial court authorized the guardian of Inez's estate, the Northern Trust Company (Northern Trust), to amend the plan. *Estate of Howell v. Howell*, 2015 IL App (1st) 133247, ¶ 41, 36 N.E.3d 293 (finding estate coguardians were statutorily empowered to act in an adult ward's best interests, which could include deviating from rules of intestacy in crafting an estate plan, and remanding for an evidentiary hearing to determine the ward's best interests). The current plan excludes Inez's father and eight paternal half-siblings and benefits Inez's mother, sister, and three maternal half-siblings. The appellants contend it was error to allow the amendment because the Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2016)) does not authorize amending a trust to deviate from intestacy, *Howell* is not on point, and, in any event, the hearing evidence should have been subjected to the clear-and-convincing standard instead of the preponderance standard. *Howell*, 2015 IL App (1st) 133247.

¶ 2 Appellant Martin, born on August 14, 1967, and Inez's mother, appellee Jennifer M. Vega, née Garcia, born on May 3, 1978, began dating on an unspecified date when he was in his early twenties and she was about 13 years old. We calculate the age gap between Jennifer and Martin to be 10 years, 8 months, and 19 days. Martin had already fathered two children with two different women. His daughter Salina Castaneda was born on September 1, 1987, and his daughter Yolanda Rivera Frederick was born on May 8, 1991. Jennifer began living with Martin and became pregnant by him when she was 15 years old. Their first daughter, Inez, was born on January 1, 1995, when Jennifer was 16 years old. Inez was deprived of oxygen at birth and has consequently suffered from cerebral palsy, autonomic instability, seizure disorder, encephalopathy, and severe developmental delays. These injuries rendered Inez legally blind and incapable of walking, talking, sitting up on her own, or feeding herself. Inez is able to move her hands but cannot pick up anything or get herself out of bed. While still a young child, Inez became dependent on a gastrostomy feeding tube and a tracheostomy breathing tube. She cannot be left unattended and requires skilled assistance 24 hours a day. Within a year of Inez's birth, Martin and Jennifer had a second daughter together, Jazlyn Allison Rivera, who was born November 27, 1995. Their third child together, Martin Peter Rivera, was stillborn on October 18, 1996. Martin and Jennifer married on March 24, 1998, when he was 30 years old and she was 19 years old, and they divorced less than 8 years later, on November 8, 2005.

While Martin was married to Jennifer, he had two children with Lisa Marie Luman. Fabian A. Luman was born on December 20, 2002, and Alexia Rivera was born on March 19, 2004. After his divorce from Jennifer, Martin had four more children with Lisa and another woman, Claudia Cabrales. Martin had Gianna Rivera with Claudia on March 1, 2005, Alessandra Rivera with Lisa on December 6, 2006, Analya Rivera with Lisa on August 2, 2007, and Enaya Rivera with Claudia on December 10, 2009.

¶ 3    The record indicates that when Inez was a minor, Northern Trust was appointed as the guardian of her estate in conjunction with her receipt of the personal injury settlement. The estate is the legal owner of Inez's home, stock, and cash. Shortly after Inez's eighteenth birthday in 2013, Jennifer petitioned the court to adjudicate Inez as a disabled person, appoint Jennifer as the sole guardian of Inez's person, and appoint Northern Trust as guardian of her estate. Martin did not oppose the petition, and it was granted.

¶ 4    In 2015, after Inez's twentieth birthday, Northern Trust petitioned for authority to execute estate planning documents and fund a revocable trust and pour-over will so that upon Inez's death, her remaining assets could be distributed to her heirs without incurring the costs and delays of a probate estate. Northern Trust specified that the proposed estate plan would not affect Inez's access to her assets during her lifetime and that if the proposed plan were adopted, it could be changed at any time, either by the court, or by Inez, if she were later determined to have testamentary capacity. The estate plan, which was proposed to and approved by circuit court Judge Carolyn Quinn on May 19, 2015, provided for Inez's parents and siblings (both full and half) to be equal heirs.

¶ 5    At the time that Inez's initial estate plan was being considered and approved, an appeal was pending in *Howell*, 2015 IL App (1st) 133247, which questioned whether a guardianship court could consider an estate plan deviating from intestacy for a disabled young adult who never had testamentary capacity. Like Inez, the disabled adult in *Howell* had received compensation for personal injuries. Under the rules of intestacy, most of the disabled ward's $11 million estate would be distributed upon his death to the father, whom it was alleged had never lived with him, never assisted in his care, visited only occasionally, and contributed an insignificant amount toward his support and comfort, and the father's 10 other children, whom it was alleged had never met the disabled ward. *Howell*, 2015 IL App (1st) 133247, ¶ 1. Relying on the "substituted judgment" doctrine, his mother and Northern Trust, who were the coguardians of his estate, argued that the disabled adult would want his assets to go to his mother, who was his full-time caretaker, rather than also being shared under intestacy rules with his father and 10 half-siblings. *Howell*, 2015 IL App (1st) 133247, ¶ 8. We reversed the trial court's determination that the only possible plan was to follow intestacy. *Howell*, 2015 IL App (1st) 133247, ¶ 41. We remanded for an evidentiary hearing, explaining that "reading the relevant sections of the Probate Act together, the preferred approach to estate planning is to follow the ward's subjective wishes, to the extent those wishes can be ascertained, but the overriding principle is to act in the ward's objective 'best interests.' " The relevant provisions of section 11a-18 of the Probate Act were subsections (a) and the very next paragraph, (a-5), both of which concern duties of an estate guardian, and will be set out as relevant below. 755 ILCS 5/11a-18(a), (a-5) (West 2016).

¶ 6    After *Howell* was filed on June 19, 2015, Northern Trust met with Jennifer and Martin about the possibility of deviating from intestacy in Inez's estate plan if the guardianship court determined that this was in her best interests. In December 2015, Northern Trust requested

direction from Jennifer, in her capacity as the guardian of Inez's person, regarding Inez's possible wishes for her estate plan. Jennifer recommended that the sole beneficiaries of Inez's estate plan be five individuals: the full sister, Jazlyn, who had lived with Inez until moving out as an adult; the three young half-sisters, Samantha, Jessica and Emma, who continued to live with Inez; and the parent who had always been her caretaker, Jennifer.

¶ 7    That same month, on December 10, 2015, Martin returned to the domestic relations division of the circuit court, where his marriage to Jennifer had been ended by a judgment order in 2005, and filed a petition for visitation with Inez. In this 2015 petition, Martin alleged, "The parties had an informal visitation agreement that took place at [Jennifer's] residence but recently she told [Martin] that she was not going to allow him any more visitation with [Inez]." Martin further alleged that Inez's physical condition had deteriorated to the point that she was *in extremis* (in her last illness or near death), it was impracticable for her to be transported for visitation, and that he had a right to visit his child. That same day, Jennifer advised the domestic relations judge that Inez had been adjudicated a disabled adult and that the probate division of the circuit court had jurisdiction over visitation questions. The domestic relations judge agreed with Jennifer and ordered that Martin's petition be heard in the probate division. The probate division judge reappointed Peter Schmiedel as the guardian *ad litem* in this matter and entered a briefing schedule.

¶ 8    Next, in early 2016, Northern Trust filed a verified petition in the probate division, seeking judicial direction regarding further estate planning on Inez's behalf.

¶ 9    Before proceeding to a best interests hearing on Northern Trust's petition, the parties addressed Martin's visitation petition. Jennifer filed a section 2-619 motion to dismiss Martin's visitation petition (735 ILCS 5/2-619(a)(9) (West 2014)) and first argued that the facts militated against allowing Martin to have visitation. She contended that Martin had consistently chosen to have only sporadic and minimal contact with Inez during her lifetime regardless of whether she was undergoing one of her numerous and long hospitalizations, where he had the unimpeded ability to visit, or was at home with Jennifer. For instance, when Martin visited Inez at home in October 2015, he had not seen her in two-and-a-half years. Jennifer contended that the few visits that did occur had been initiated by her and that Martin's new interest in visitation was motivated by the possibility of his disinheritance. Jennifer noted that Martin also made no effort to contact or visit their 20-year-old daughter, Jazlyn, who was residing in her own apartment. Jennifer's second point was that Inez did not know Martin and was not aware of him. Jennifer also said she was afraid of Martin because of his history of violence and abuse, which included criminal convictions, time in the penitentiary, and beating her when she was nine months pregnant in 1996 to the point that their son was stillborn a week later, and Jennifer, Inez, and Jazlyn had to flee to a shelter despite Inez's medically precarious condition. These facts led Jennifer to state that it was not in Inez's best interests to be visited by Martin. Jennifer also contended that, as the sole legal guardian of Inez's person, Jennifer, not the court, had authority to make decisions concerning visitation and that Martin had no standing to assert a right of visitation with his adult daughter. The guardian *ad litem* informed the court that he made a home visit and found, as he had during previous home visits with Inez, that she was receiving excellent care; that, during a telephone interview, Martin admitted to infrequent visits with Inez but blamed the situation on Jennifer; and that it was unnecessary for the court to determine why Martin's visits were sporadic because Martin had no standing to challenge Jennifer's visitation decision. After oral arguments in March 2016, the probate

division judge denied Martin's petition for visitation due to his lack of standing, and it was agreed that any future discussion about visitation would be handled by counsel rather than direct communication between Jennifer and Martin. During the hearing, the judge emphasized that the parents should not request or refuse visitation out of a belief that they would influence the court's ruling on the estate planning issue because the court would be taking a comprehensive look at Inez's entire life.

¶ 10      The parties next prepared and filed legal briefs regarding the best interests hearing that would be conducted over two days in October 2016.

¶ 11      Jennifer was the first witness at the hearing regarding Inez's family life. Jennifer testified that she and Inez were residing in Orland Park, Illinois, with Jennifer's husband, Emanuel Vega Jr. and their three daughters, Samantha, Jessica, and Emma Vega. Inez had to spend a month in the hospital after she was born. Jennifer and Martin's relationship had been "off and on," and at the time he was still dating Karen Varella, the mother of his second child, Yolanda. Martin did not visit Inez on his own, and went to the hospital only once or twice when Jennifer "begged" him for a ride so she would not have to take the bus as she "often" did during that month. When Inez was discharged, Jennifer took the baby home to her mother's house. Martin and Jennifer continued their "off and on" relationship and subsequently had Jazlyn and Martin Peter. Martin Peter was stillborn because Martin "became physical," "would always hit" Jennifer, and was "abusive." Martin hurt Jennifer in front of Jazlyn and Inez, and he struck Jazlyn in Inez's presence. Martin, however, never hurt Inez.

¶ 12      Jennifer broke off the relationship and divorced Martin when she and Jazlyn moved to Orland Park in 2005. Jennifer was granted sole custody of Inez. Martin was not required to pay monthly support for Inez because of her settlement; however, he has never provided any monetary support for her or given her any Christmas or birthday cards or any gifts. Martin did make some of the court-ordered monthly payments toward Jazlyn's support, but then he stopped.

¶ 13      Inez needs care every day, 24 hours a day, which she receives primarily from a registered nurse. She also has weekly or monthly visits from a teacher, an occupational therapist, and a physical therapist. Jennifer takes sporadic eight-hour nursing shifts, and otherwise cares for Inez. Inez smiles when she hears her mother's voice and can signal when she is hungry. Jennifer has received training that enables her to replace Inez's "G-tube," give medication, and change and bathe her daughter. Regardless of the time of day or night, Inez needs to be moved into a different position at least every two hours so that her sensitive skin does not break down. Martin has never received any training to care for Inez, and he has never spent time alone caring for her. Many years ago, Jennifer agreed to bring Inez to a mall for some visitation time with Martin, and although they waited for him for two hours, Martin did not show up. The record includes an order dated June 7, 2010, which appears to have been handwritten by Martin's attorney, indicating Martin would have visitation with Inez and Jazlyn every other Saturday "in the food court of the Orland Park Mall, by Taco Bell, from 12:00 pm to 4:30 pm." Other than the 2005 judgment order dissolving the marriage, giving Jennifer custody and Martin visitation with Inez and Jazlyn, this 2010 order was the only order regarding visitation. Jennifer did not deny Martin the opportunity to come visit Inez at home and she used to ask him to visit his daughter there, but Martin chose to visit Inez only "[w]hen he feels like it," which was less than once a year, and only for 15 or 20 minutes at a time. However, after the

meeting with Northern Trust regarding a revision to Inez's estate plan, Martin indicated he wanted visitation.

¶ 14    Inez has a "hospital quality" room on the ground floor of the Orland Park residence, and the kitchen doorway and counter have been modified so that she can spend time with the family in the kitchen. Jennifer's husband, who has not been included in the estate plan, spends time with Inez every day. Inez has a "[t]rue friendship" with her little sisters Samantha, Jessica, and Emma, and also a good relationship with her sister Jazlyn. Jazlyn went away to boarding school for two or three years of high school and was at home again between the ages of 16 and 18, before moving out as an adult. Since she has moved out, Jazlyn still visits Inez and calls to ask about her. Jazlyn is now learning how to take care of Inez.

¶ 15    One of Martin's daughters with Claudia, Anaya, has never visited Inez, and Jennifer has never met Anaya. Martin's daughter Gianna and Gianna's mother, Claudia, lived with Jennifer for a couple of months because the women "became friends, and [Jennifer] felt sorry for [Claudia]." Other than staying in the house, Claudia did not have contact with Inez. Jennifer was unsure if she knew Lisa's daughters Analya or Alexia or if they had ever visited Inez. Martin brought Lisa's other children "sporadically," specifically, Alessandra came to visit Inez once or twice, and Fabian came three or four times. Their last visit had been in October 2015, a year before the best interests hearing. Martin's oldest child, Salina, has never met Inez. Yolanda had last visited Inez five years ago, but started calling after Jennifer and Martin met with Northern Trust about revising the estate plan.

¶ 16    Neither Martin nor any of these other children have attended any of Inez's school events, such as her graduation from middle school, and Martin has never attended the Individual Education Planning meetings about Inez's schooling. Martin had never taken custody of Inez to provide care for her and never assisted with her physical or occupational therapies.

¶ 17    As Inez's mother and the legal guardian of her person, Jennifer recommended that she and her daughters be included in Inez's estate plan because they have maintained relationships with Inez, but that Martin and his children with other women should be left out because they never had relationships with Inez.

¶ 18    On cross-examination, Jennifer said she was uncertain about the dates, but that after Inez came home from the hospital, Jennifer and the baby moved back and forth between her mother's house and either Martin's mother's house or an apartment. After Jennifer and Inez moved into the house in Orland Park in 2005, Martin only visited for a couple of nights and never lived there. Those visits stopped 9 or 10 years before the best interests hearing, and Jennifer and Martin's sexual relationship stopped in 2006. The divorce was granted on grounds of irreconcilable differences, not physical cruelty, but there were "a lot" of times when Jennifer had to protect herself from being struck by Martin, and the neighbors, not Jennifer, would call the police. Jennifer pressed charges against Martin once, but the charges were dropped. Inez was first assigned caregivers after she was discharged from a hospital stay when she was almost three years old and had "a trach and G-tube." Martin was "in and out of jail" during this time period and did not assist with Inez's care. Martin helped Jennifer bathe Inez once, when she was still in the hospital after her birth, and he might have changed her diaper once. Inez is not able to make choices. When asked whether Jazlyn and Yolanda had a friendship, Jennifer answered that Martin and Yolanda's mother, Karen, had an agreement that "he was supposed to watch her," so Jennifer babysat Yolanda when the children were little and the family did not have the house in Orland Park. Martin, Yolanda, and his other children would sometimes come

visit; Yolanda came for a visit by herself once when Jazlyn was away at school, and her last visit was in 2011.

¶ 19    On redirect, Jennifer indicated that she was 5 feet tall and Martin was 6 feet, 2 inches or 6 feet, 3 inches tall; that she was physically afraid of him; and that after Martin was stillborn, she had taken Jazlyn and Inez with her to a domestic violence shelter.

¶ 20    Jazlyn, who was 20 years old at the best interests hearing, testified that she grew up living with her mom, occasionally stayed over with her dad as a preteen or young teen, and then went to boarding school between the ages of 15 and 17. Inez always lived with Jennifer. Jennifer took responsibility for Inez's care, cleaning, feeding, and doctor's visits. Martin did "[t]he bare minimum" to take care of Inez, he "pretty much neglected" Inez and Jazlyn, and he was aggressive, abusive, and violent toward Jennifer. Martin hit Jennifer in front of Jazlyn. Jazlyn could not recall if Inez was also present. "On a scale of one to 10, [Martin's level of violence was] like nine." After boarding school, Jazlyn returned home for about two years. She now visits the family at least twice a month and has a stable, loving relationship with Inez. Inez is "very happy when she sees [Jazlyn]" and also loves her little sisters. Jazlyn confirmed that she has not seen Martin's other children visiting at the Orland Park house.

¶ 21    On cross-examination, Jazlyn attributed her stay at the boarding school to being a "troubled teenager" who was depressed because she "didn't have a stable family." During this phase, Jazlyn had to take prescription medication for depression and anxiety, but she no longer needs medication. When Jazlyn visits and kisses Inez on the check, Inez smiles instantly and moves her arms.

¶ 22    Yolanda Frederick, who was 25 at the best interests hearing, testified that the last time she saw Inez was at Inez's house in 2013 when Yolanda "got out of basic training." Yolanda and Martin have been in Inez's life "consecutively" and "[t]here hasn't been a time where it stopped and started." Yolanda went to the hospital with her father and mother (Karen Varella) when Inez was born, and then visited Inez at home as often as she could, meaning "all the time," every other weekend, and after school on weeknights. Martin was still living with Jennifer even after Yolanda graduated from high school in 2009. Martin lived in the Orland Park house with Jennifer, Claudia, and sometimes Lisa, as well as Jazlyn, Fabian, and Inez. After high school, Yolanda and Martin did not visit Inez as frequently, but they did try to visit. They went to the house at least 15 times between 2009 and 2011, but Jennifer would not grant them access through the security gate, and she would text or call to say they could not visit. Yolanda was in the National Guard between 2011 and 2014. She visited once in 2013, to introduce her then-husband. Yolanda has attempted to visit since, but has not been able to.

¶ 23    On cross examination, Yolanda said she lived in Lemont with her mother during high school, but would nevertheless "frequently" drive 15 or 20 minutes after school to visit in Orland Park. Yolanda would drive her mother's car, until she was 17 and her mother bought Yolanda her own car. Even after Martin was no longer living in the Orland Park home, Yolanda would visit. She would spend at least two weekends a month at the house, if Martin was there. Yolanda denied knowing why she was testifying, said her grandmother told her Martin and Jennifer were "battling over stuff for Inez," and stated that she did not "understand the legalities of it." Yolanda was aware that if she testified that she had not seen Inez in five years, as was alleged in the petition for direction from the court, Yolanda might be excluded from the estate. Yolanda denied speaking with Martin's attorney before the hearing and said she did not know what questions would be posed to her.

¶ 24    Daniel Loy said he lived in the Orland Park home with Jennifer and Martin between 2005 and 2009. For a while he lived upstairs, but then moved to the basement. He never witnessed an argument between Jennifer and Martin and never saw them strike each other. He saw Martin visiting Inez. On cross examination, Daniel reiterated that he lived in the Orland Park house for four years and said he received his work checks and W2 forms at that address. Daniel and Martin were childhood friends. Daniel saw Martin change Inez's diaper two or three times a day, change her feeding tube "maybe once a day," and administer medication. Daniel admitted that he could not see any of this from downstairs in the basement, but he was "pretty sure [Martin's] in there doing something, feeding her, taking care of her."

¶ 25    Lisa Marie Lumen testified that she has four children with Martin and that he supports those children, "always has been there," sees the children daily, and is "a very loving father." Lisa met Jennifer in April 2002, when Lisa and Martin were living on Burnham in South Chicago, and Jennifer and Jazlyn came to stay with them for three months. The women next encountered one another in 2004, when Jennifer and Jazlyn came to pick up Martin from his mother's house in Hammond. They also had contact at the Orland Park residence, once in 2005, once in 2006 when Lisa stayed over after Inez's birthday party, and then periodically throughout 2006. Lisa observed that Daniel was living in the basement in 2006. Lisa's children would come with her and would visit Inez. Inez would respond by smiling and moving around. Lisa's last visit to the Orland Park home was in 2007 because Jennifer said that Lisa was no longer welcome and then blocked Lisa's phone calls. Lisa's children, however, continued to go there with Martin at least once or twice a year until 2010 or 2011, and then one more time in October 2015. On cross examination, Lisa acknowledged that she was not in the Orland Park home after 2007, when her children were purportedly visiting Inez, and that she had not seen Martin interact with Inez in nine years. She had testified that Martin sees their children every day, but admitted that when their first two children were born, Martin was married to Jennifer. Lisa was unaware that Jennifer had remarried and had more children. Martin's current girlfriend is Nece Flores.

¶ 26    Martin testified that when Inez was born, he and Jennifer were living with Jennifer's mother, Ursula Garcia. When Inez came home from the hospital, Jennifer was the caregiver but Martin "participated at times." Inez lived in a rehabilitation center between 1998 and 2005. During those years, Martin would visit Inez "[m]aybe three times out of the month" by himself, with Lisa, or with his mother, and Jennifer was not always present for those visits. During that time period, his relationship with Jennifer was "off and on," and he sometimes lived with her. Inez was released from the rehab center in 2005 to go live in the new house in Orland Park with Martin, Jennifer, Jazlyn, and later also Daniel. Even though Jennifer and Martin divorced in November 2005, Martin continued to live in the Orland Park home for almost the next four years. By watching Jennifer, Martin had learned how to clean Inez's trachea tube, add a syringe of formula to her feeding tube, wash her, and change her clothing. Whenever Jennifer was too tired, which was "maybe two three times every now and then," Martin "would help her out" and perform these procedures himself.

¶ 27    Martin lived in the Orland Park home until 2009. After that, he was "able to visit here and there" but there were times that Jennifer would ignore his calls or texts or would respond with "an excuse for [Martin] not to go." There were also "at least 10 plus" times that Martin attempted to visit between 2009 and 2010 when Jennifer would not permit him access through the security gate.

¶ 28    In 2010, Martin petitioned the court and was granted visitation a couple of hours every other Saturday at the Orland Park mall. Martin went once but was not given a specific meeting point within the "pretty big" mall, so he contacted Jennifer on her cell phone, and she did not respond. Martin did not have visitation after that because "[s]he was finding an excuse for me not to see her anymore. She wasn't answering any of my calls anymore." Jennifer did not initiate contact with Martin, and he was "assuming she was upset, and she just didn't want me to see her."

¶ 29    When Martin and Jennifer lived together at 8628 South Burnham, there were some violent episodes between them because Jennifer "gets short tempered" and "throws cups, glasses, you name it," and would strike and scratch him. Jennifer was arrested once because a neighbor called the police, and "they saw where she had threw the knife at [Martin]." There were times when Martin would respond to Jennifer's attacks and they would "put hands on each other." Jennifer's attacks on Martin were "fighting over nonsense" and did not concern Inez's care.

¶ 30    On cross-examination, Martin acknowledged that he could have returned to court to enforce the 2010 visitation order, but he said, "I took it into my own hands to call her and repeatedly called her to visit my daughter." He also acknowledged there was an Illinois law making it "a crime to interfere with visitation," meaning that he could have made a police report that Jennifer was failing to cooperate with the visitation order, but he did not make that report. Although Jennifer was interfering with his visitation, he did not object in 2013 to her petition to be appointed Inez's sole legal guardian because he "didn't know exactly what the laws were." As for the time Jennifer was arrested for attacking him, Martin did not know if she ever went to court, and his lawyer never told him that Jennifer was convicted of any crime.

¶ 31    Martin acknowledged "[p]utting hands, [in] self defense" on Jennifer, that he had "punched" her but was unsure how many times, and that he kicked her while she was on the ground, but he was unsure how many times. Martin denied punching and kicking Jennifer when she was pregnant with their son who was later stillborn, but he acknowledged that after "she lost the baby, she went to a shelter for battered women." According to Martin, he never hit Jennifer during the pregnancy; instead, she fell down outside the house, he picked her up, and two or three days later she said the baby was not moving. At the hospital, they said the baby had died.

¶ 32    With regard to Martin's testimony that he lived in the Orland Park house with Jennifer between 2005 and 2009, Martin said he was not sure whether she became engaged in 2007, he was not sure whether she remarried in 2009, he denied living in the house with her new husband when she was pregnant, and he was not aware that she had a baby in 2009. Martin then said he moved out in the beginning of 2009. Until then, his clothes, shoes, paintings, and treadmill were there, and the treadmill was still there to this day. Martin admitted he never had the Orland Park address on his driver's license.

¶ 33    Martin has four felony convictions: one for drug possession in 2003, one prior to that for unlawful use of an unregistered weapon, and two others that he could not recall, although one of them might have been for assault or battery.

¶ 34    Martin said the reason he never took any training to care for Inez was he "was never asked to" and it had never occurred to him to be trained, but he knew how to care for Inez and had "helped [Jennifer] do it."

¶ 35    Martin said he was in court because he was fighting for his other children's right to inherit from Inez.

¶ 36    Jennifer was called as a rebuttal witness. Jennifer disagreed with Yolanda's testimony that she visited the Orland Park residence frequently as a teenager. Jennifer said the visits were "[w]ith her father sporadically." When Yolanda was two years old, Martin would drop her off so that Jennifer would babysit her during his visitation time. David Loy lived in the Orland Park house only in 2005 for two months. Jennifer started dated her second husband in 2006, and David Loy was no longer living in the basement. Jennifer was "always" at the hospital when Inez had to live there between 1999 and 2005 and observed that Martin did not come to visit Inez. Jennifer was there as often as twice a week and would stay from 9 a.m. to almost 8 p.m. It was possible that Martin came later in the day. There was a sign-in log that Jennifer had to use. Jennifer and her mother took training at the hospital to care for Inez, but the training was never offered to Martin because "[h]e never came."

¶ 37    The guardian *ad litem*, Peter Schmiedel, testified that he had also been appointed by the court in the fall of 2009 when Inez was a minor and the question was whether a "do not resuscitate" order should be in place. At the time, Inez was living in the Orland Park house, and Schmiedel visited there at least twice. Jennifer was living there, but not Martin, and his whereabouts were actually unknown then. Schmiedel observed that Inez was receiving excellent care, Jennifer was interacting very well with her, and there could not be a safer or more appropriate placement for Inez. Schmiedel, who was reappointed for another issue in 2013, observed that Inez's health had improved, that her hospitalization time had gone down, that Jennifer was again cooperative with his investigation, and that he had no contact with Martin. Schmiedel was appointed for the current issue in early 2016, at which point Martin's lawyer provided his client's phone number, and Schmiedel called to discuss Martin's visitation history. Martin said that he visited Inez only 9 or 10 times in the last 7 years. With regard to whether it was in Inez's best interests to deviate from intestacy, Schmiedel was of the opinion that Inez could not express her wishes. Also, the factors the court should consider in determining a testamentary plan were who resided with the ward, cared for her, and demonstrated a long-standing relationship, which in this instance were Jennifer and her immediate family. The court should also look at negative interactions, such as domestic violence, and whether family members had contributed to Inez's well being and day-to-day care, when the court determined who should take from the estate and what percentage they should take. Schmiedel was of the opinion that the evidence indicated the court should deviate from intestacy in this instance.

¶ 38    On cross-examination, Schmiedel said he made two home visits in 2009, for probably an hour each time, and that it was possible Martin visited before or after him. At the time, however, Jennifer told Schmiedel that she did not have Martin's contact information. Schmiedel had a one-hour phone conversation with Martin regarding the current issue and came to the conclusion that visiting 9 to 10 times in a 7-year period was "not a very consistent visitation pattern." Schmiedel also held the opinion that the trial court should take into consideration whether Martin and his other children had a consistent relationship with Inez over the years.

¶ 39    During the best interests hearing, Jennifer and Martin tendered photos of themselves with Inez at various ages. After the hearing concluded, they prepared and submitted legal briefs to assist the court with its analysis. About two months after the hearing, Jennifer, Jennifer's attorney, Martin's attorney, and the guardian *ad litem* returned to court on December 12, 2016, to obtain the judge's ruling.

¶ 40    The judge first found that the preponderance-of-the-evidence standard set out in *In re Estate of Michalak*, 404 Ill. App. 3d 75, 934 N.E.2d 697 (2010), was controlling, and that the cases Martin was relying upon for the clear-and-convincing standard either were not guardianship cases or were guardianship-of-the-person cases. The judge also took into consideration that the legislature had added the clear-and-convincing standard to certain sections of the Probate Act, such as whether to sterilize a ward or terminate a ward's marriage, but the legislature did not include this standard in section 11a-18 of the Probate Act, which is the section relevant to these proceedings. 755 ILCS 5/11a-18 (West 2016) (defining the duties of the guardian of a disabled adult's estate).

¶ 41    Applying *Howell*, the judge next indicated that Inez would execute an estate plan if she was not under a disability. The evidence of Inez's severe, permanent impairment supported the position of the guardian of the estate, guardian of the person, and the guardian *ad litem* that proceeding with an estate plan was appropriate and that Inez lacked any ability to express her wishes about an estate plan. The natural objects of Inez's bounty would include those who care for and are involved in her life, as opposed to those who are not. Jennifer and Jazlyn have a close relationship with Inez, and the three little sisters also have an active and true friendship with Inez. Martin, however, has played a far smaller role in Inez's life than Jennifer's second husband. It was undisputed that Martin and Jennifer's relationship as a couple had been "off and on" and punctuated by violence. The judge did not find Martin credible when he said he acted in self defense and when he said that Jennifer fell outside the house instead of being a victim of domestic violence. Martin has a criminal history, and Jennifer was credible and reasonable when she said she wanted to limit her family's contact with Martin. The guardian *ad litem* and Jennifer credibly testified that Martin's visits were rare and that Jennifer did not block his visitation until recently. Martin's contentions that he did not move out of the Orland Park house until 2009 and that Jennifer stymied his attempts to visit were undermined by the fact that he did not attempt to enforce the 2010 visitation order even though he blamed Jennifer for being nonresponsive to his phone calls and the fact that he did not seek visitation again until years later when Inez's estate plan was being discussed. David Loy was not credible when he said Martin lived in the house between 2005 and 2009, particularly since Loy contended he saw Martin taking care of Inez but then Loy admitted he did not see Martin performing any of the tasks. Martin's lack of commitment to Inez's care was underscored by his failure to seek training as a caregiver and his inability to identify a single witness who would confirm that he was capable of rendering appropriate care to her. The judge also found Yolanda not credible when she testified that she was a frequent visitor as a teenager and that she was ignorant of the purpose of the best interests hearing. The judge also considered Lisa's testimony that her children visited Inez infrequently and had not seen Inez since 2007.

¶ 42    The judge concluded that the preponderance of the evidence indicated it was in Inez's best interests to deviate from intestacy, to include those family members who had consistent and loving relationships with Inez, and to exclude those family members who did not. The judge directed Northern Trust to move forward on a new estate plan and denied Martin's motion for reconsideration. Martin has taken this appeal to challenge those two rulings. Illinois Supreme Court Rule 304(b)(1) gives us jurisdiction to consider his appeal. Ill S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016) (conveying jurisdiction to review a judgment or order entered in the administration of an estate, guardianship, or similar proceeding that finally determines a right or status of a party). Jennifer filed a response brief in her capacity as Inez's personal guardian,

the guardian *ad litem* agreed with Jennifer's arguments and rationale and adopted her brief as his own instead of filing a separate brief, and Northern Trust subsequently filed a response brief in its capacity as the estate guardian. We also have benefit of Martin's reply brief.

¶ 43 Martin first argues it was reversible error to permit Northern Trust to amend Inez's estate plan to disinherit Martin and his other children, when there was no statutory authority to make this change. Martin's argument implicates section 11-18(a) of the Probate Act, the next paragraph, section 11-18(a-5), and our opinion in *Howell* regarding these two portions of the statute. *Howell*, 2015 IL App (1st) 133247.

¶ 44 Section 11a-18(a) provides as follows:

" '(a) To the extent specified in the order establishing the guardianship, the guardian of the estate shall have the care, management and investment of the estate, shall manage the estate frugally and shall apply the income and principal of the estate so far as necessary for the comfort and suitable support and education of the ward, his minor and adult dependent children, and persons related by blood or marriage who are dependent upon or entitled to support from him, *or for any other purpose which the court deems to be for the best interests of the ward*, and the court may approve the making on behalf of the ward of such agreements as *the court determines to be for the ward's best interests*.' " (Emphases in original.) *Howell*, 2015 IL App (1st) 133247, ¶ 18 (quoting 755 ILCS 5/11a-18(a) (West 2000)).

¶ 45 In *Howell*, we characterized section 11a-18(a) as setting "the ward's 'best interests' as the touchstone for all actions taken by an estate guardian." *Howell*, 2015 IL App (1st) 133247, ¶ 12.

¶ 46 The next paragraph of the statute, section 11a-18(a-5), provides more detail about the estate guardian's duties, specifying that the estate guardian is to give notice to all other interested parties and petition the court for approval of actions or applications of funds that are "in keeping with the ward's wishes so far as they can be ascertained":

" 'The probate court, upon petition of a guardian, other than the guardian of a minor, and after notice to all other persons interested as the court directs, may authorize the guardian to exercise any or all powers over the estate and business affairs of the ward that the ward could exercise if present and not under disability. The court may authorize the taking of an action or the application of funds not required for the ward's current and future maintenance and support in any manner approved by the court as being in keeping with the ward's wishes so far as they can be ascertained. The court must consider the permanence of the ward's disabling condition and the natural objects of the ward's bounty. In ascertaining and carrying out the ward's wishes the court may consider, but shall not be limited to, minimization of State or federal income, estate, or inheritance taxes; and providing gifts to charities, relatives, and friends that would be likely recipients of donations from the ward. The ward's wishes as best they can be ascertained shall be carried out, whether or not tax savings are involved.' " *Howell*, 2015 IL App (1st) 133247, ¶ 17 (quoting 755 ILCS 5/11a-18(a-5) (West 2000)).

¶ 47 Continuing into further detail about permissible "action[s] or the applications of funds," section 11a-18(a-5) sets out a nonexhaustive list of examples, stating that "[a]ctions or applications of funds may include, but shall not be limited to, the following," including what was the subject of the *Howell* litigation, "(6) creating for the benefit of the ward or others, revocable or irrevocable trusts of his or her property that may extend beyond his or her

disability or life." 755 ILCS 5/11a-18(a-5)(6) (West 2016). Martin focuses on the last entry in the list of examples, "(11) modifying by means of codicil or trust amendment the terms of the ward's will or any revocable trust created by the ward, as the court may consider advisable in light of changes in applicable tax laws." 755 ILCS 5/11a-18(a-5)(11) (West 2016).

¶ 48    After this list of examples, section 11a-18(a-5) concludes with further detail about the contents of the estate guardian's petition, identifies various individuals and charities who may benefit from the disposition of estate funds, and specifies that the estate guardian need not make dispositions to "any person who he has reason to believe would be excluded by the ward":

"The guardian in his or her petition shall briefly outline the action or application of funds for which he or she seeks approval, the results expected to be accomplished thereby, and the tax savings, if any, expected to accrue. The proposed action or application of funds may include gifts of the ward's personal property or real estate, but transfers of real estate shall be subject to the requirements of Section 20 of this Act. Gifts may be for the benefit of prospective legatees, devisees, or heirs apparent of the ward or may be made to individuals or charities in which the ward is believed to have an interest. The guardian shall also indicate in the petition that any planned disposition is consistent with the intentions of the ward insofar as they can be ascertained, and if the ward's intentions cannot be ascertained, the ward will be presumed to favor reduction in the incidents of various forms of taxation and the partial distribution of his or her estate as provided in this subsection. The guardian shall not, however, be required to include as a beneficiary or fiduciary any person who he has reason to believe would be excluded by the ward. A guardian shall be required to investigate and pursue a ward's eligibility for governmental benefits." 755 ILCS 5/11a-18(a-5) (West 2016).

¶ 49    Reading these paragraphs together, we came to the conclusion in *Howell* that the guardian of the estate of a disabled adult is obligated to propose to the court that a trust established as part of an estate plan include as beneficiaries only those individuals whom the guardian has reason to believe the ward would choose to include, if the ward was present and not under disability. *Howell*, 2015 IL App (1st) 133247, ¶ 29.

¶ 50    Martin, however, contends the estate plan that was adopted for Inez was not authorized by this statute. Martin points out that the estate plan that was originally adopted for his daughter followed the rules of intestacy and that intestacy is based on the sound principle that a person's estate should benefit the natural objects of the person's bounty, including those individuals who are related to the person by blood or who have ties of affection. *DeHart v. DeHart*, 2013 IL 114137, ¶ 20, 986 N.E.2d 85 (defining the "natural objects of one's bounty"). Section 11a-18 of the Probate Act defines the duties of an estate guardian, and Martin contends subsection (a-5)(11) contains the only statutory language that in any way implicates disinheritance when it states that the guardian of a disabled ward's estate may "modif[y] by means of codicil or trust amendment the terms of the ward's will or any revocable trust created by the ward, as the court may consider advisable *in light of changes in applicable tax laws.*" (Emphasis added.) 755 ILCS 5/11a-18(a-5)(11) (West 2016). Martin reads the quoted language to mean that once a trust agreement has been adopted for a disabled adult ward, the plan may be modified only to reflect changes in the tax code. He contends that Northern Trust's petition for judicial direction in 2016 clearly acknowledged that an estate plan, based

on intestacy, had been approved for Inez in 2015, and that nothing in the 2016 petition could be construed as a concern about the tax implications of that plan. According to Martin, Northern Trust's petition "disingenuously" referred to the broadly worded paragraph (a-5) rather than the only subparagraph that authorizes disinheritance, (a-5)(11), and erroneously cited *Howell* for the proposition that the statute authorized the estate guardian to "start fresh" in creating an estate plan for Inez. *Howell*, 2015 IL App (1st) 133247. Martin contends that *Howell* "conflates the general language of paragraph (a-5) with the specific language of [sub]paragraph (a-5)(11)," and in so many words, Martin is contending that *Howell* was wrongly decided. Alternatively, Martin contends *Howell* should be limited to its facts, which were the creation of a new trust, rather than the modification of an existing trust, and should be deemed irrelevant to the current proceedings. Martin concludes that the plain and limiting language of section 11a-18(a-5)(11) regarding disinheritance was not properly followed here and that the order entered in excess of the court's statutory authority must be voided. See *Cushing v. Greyhound Lines, Inc.*, 2012 IL App (1st) 100768, ¶ 105, 965 N.E.2d 1215 (voiding the trial court's appointment of a special administrator where the court had exceeded its statutory authority).

¶ 51 "The construction of a statute, including section 11a-18(a-5)(11) of the Probate Act, is a question of law, which this court reviews *de novo.*" *Michalak*, 404 Ill. App. 3d at 84-85. "Our supreme court has consistently held that '[t]he cardinal rule of statutory construction, and the one to which all other cannons and rules must yield, is to ascertain and give effect to the true intent and meaning of the legislature.' " *In re Mark W.*, 383 Ill. App. 3d 572, 588-89, 895 N.E.2d 925, 939 (2008) (quoting *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 401, 875 N.E.2d 1096, 1100 (2007)). Because the words chosen by the legislature are the most reliable indication of the legislature's intent, we give the statutory language its plain and ordinary meaning. *In re Mark W.*, 383 Ill. App. 3d at 588-89.

¶ 52 Northern Trust, Jennifer, and the guardian *ad litem* respond that Martin failed to make his statutory construction argument in the trial court and, therefore, it is waived. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413, 775 N.E.2d 951, 958 (2002). Martin acknowledges that the argument is a new one, but points out that all the parties fully briefed the issue and that even if he had made the argument in the trial court, it would have been addressed *de novo* on appeal. Martin urges us to consider his argument, in the interests of justice. We choose to address Martin's argument because doing so is simple and straightforward.

¶ 53 Martin's argument was rejected almost eight years ago in *Michalak. Michalak*, 404 Ill. App. 3d 75. The appellants in *Michalak* relied on the same language Martin relies on, contended that the plain language of subsection 11a-18(a-5)(11) was intended to be a restriction on the broad permissive language of 11a-18(a-5), and concluded that amendments to estate plans were thereby permitted solely to take advantage of changes in the tax laws. *Michalak*, 404 Ill. App. 3d 75. The *Michalak* court merely read the language of the statute, noting that the legislature's " 'consistent and exclusive use of the term "may" throughout section 11a-18(a-5)' " when listing the possible actions and applications of funds by the estate guardian and describing the role of the trial court "indicated that the provision was permissive [and not mandatory] and that the trial court may exercise its discretion in granting relief under it." *Michalak*, 404 Ill. App. 3d at 86 (quoting *In re Estate of Ahmed*, 322 Ill. App. 3d 741, 746, 750 N.E.2d 278, 281 (2001)). The *Michalak* court also found that the use of the words

" ' "include" ' " and " ' "including" ' " indicated the itemized list of permissible actions or applications of funds was not meant to be exclusive or exhaustive. *Michalak*, 404 Ill. App. 3d at 86 (quoting *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 286 Ill. App. 3d 660, 667, 676 N.E.2d 1016, 1021 (1997)). First, section 11a-18(a-5) clearly stated: " 'In ascertaining and carrying out the ward's wishes the court *may* consider, *but shall not be limited to*, minimization of State or federal income, estate, or inheritance taxes; and providing gifts to charities, relatives, and friends that would be likely recipients of donations from the ward. The ward's wishes as best they can be ascertained shall be carried out, whether or not tax savings are involved.' " (Emphases in original.) *Michalak*, 404 Ill. App. 3d at 85 (quoting 755 ILCS 5/11a-18(a-5) (West 2008)). Section 11a-18(a-5)(11) is also permissive, stating:

> "Actions or applications of funds *may* include, but shall not be limited to, the following:

> * * *

> (11) modifying by means of codicil or trust amendment the terms of the ward's will or any revocable trust created by the ward, as the court *may* consider advisable in light of changes in applicable tax laws." (Emphases in original.) *Michalak*, 404 Ill. App. 3d at 85 (quoting 755 ILCS 5/11a-18(a-5)(11) (West 2008)).

¶ 54   Thus, Martin's contention that section (a-5)(11) should be read as a limitation on the estate guardian's authority was dispensed with by *Michalak* and is not persuasive to this court. Martin urges us to "part company" with *Michalak*, but in addition to the fact that we find the analysis sound and persuasive, the legislature has signaled that the statutory language was properly interpreted in *Michalak* because the legislature has not subsequently changed the statute to correct the interpretation. *Provena Health v. Illinois Health Facilities Planning Board*, 382 Ill. App. 3d 34, 45, 886 N.E.2d 1054, 1065 (2008) (the legislature is presumed to know how courts have interpreted a statute and may amend a statute if it intended a different construction). *Michalak* states the settled law of Illinois.

¶ 55   For these same reasons, we reject Martin's contention that *Howell* should be limited to the initial creation of an estate plan for a disabled adult ward and deemed inapplicable to Northern Trust's petition to amend Inez's estate plan to exclude her father and some of his children. Martin's argument is contrary to section 11a-18's expansive and permissive description of the duties of the estate guardian, and, in particular, it goes against the estate guardian's statutory duty to always act "for the ward's best interests." 755 ILCS 5/11a-18(a) (West 2016); *Howell*, 2015 IL App (1st) 133247, ¶ 12 (section 11-18(a) "sets the ward's 'best interests' as the touchstone for all actions taken by an estate guardian"). This standard is written into the statute without any modifying language and, therefore, is in effect regardless of whether we are discussing an initial estate plan as we did in *Howell*, or an amendment to an estate plan, as we are discussing here. Furthermore, a ward's best interests are not fixed and it would be unsound to conclude that a ward's estate plan should be unmodifiable, particularly in this case where the ward is a young adult and her best interests may change over her lifetime. We find that an estate guardian is empowered and obligated by the Probate Act to amend a disabled ward's estate plan when material circumstances change and an existing plan, whether it be an original or amended version, is no longer in the ward's best interests due to a change in circumstances. According to the Probate Act, an estate guardian's duties are to manage the ward's estate "frugally" and apply the income and principal "so far as necessary for the comfort and suitable support and education of the ward, *** or for any other purpose which the court deems to be

- 15 -

for the best interests of the ward, and the court may approve the making on behalf of the ward of such agreements as the court determines to be for the ward's best interests." 755 ILCS 5/11a-18(a) (West 2016); *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 88, 666 N.E.2d 16, 23 (1996). Furthermore, the legislature has amended the Probate Act three times since *Howell* was decided, without changing the language we analyzed in that case and which the probate court judge subsequently applied to Northern Trust's petition to amend Inez's estate plan. The lack of revision to the statutory language applied in *Howell* is an indication that we construed the language as the legislature intended. *Provena Health*, 382 Ill. App. 3d at 45 (the legislature is presumed to know how courts have interpreted a statute and may amend a statute if it intended a different construction). Accordingly, we have no reason to interpret the statutory language any differently than we did in *Howell*. In *Howell*, we applied the statutory language to a disabled adult ward's initial estate plan; we now affirmatively extend *Howell*'s reasoning to amendments to a disabled adult ward's estate plan.

¶ 56     Martin's second main argument is that the trial court erred by enabling the estate guardian to impermissibly cede its decision-making authority about the estate to the personal guardian, when Northern Trust let Jennifer recommend who should benefit from Inez's estate plan upon her death. Martin contends Northern Trust "completely deferred to Jennifer *** to make the estate planning decisions" and that the Act does not empower a personal guardian to make those types of decisions. Acts of an estate guardian which exceed its statutory authority are not to be approved or ratified by the probate court. *In re Estate of Swiecicki*, 106 Ill. 2d 111, 120, 477 N.E.2d 488, 491 (1985).

¶ 57     Northern Trust, Jennifer, and the guardian *ad litem* respond that Martin failed to make this argument in the trial court and, therefore, it is waived. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413, 775 N.E.2d 951, 958 (2002). Martin concedes that the argument is a new one, but contends that in the interests of justice, we should address it.

¶ 58     We find the argument is waived. Waiver aside, we point out that Martin's argument is deeply flawed. Martin is essentially arguing that Northern Trust, a corporate trustee without any personal contact with Inez, should have formed an estate plan without input from Inez's mother, the person the record indicates has the most knowledge about Inez's family life and her contact with other persons who might be considered as the natural objects of the bounty of her estate. Furthermore, Northern Trust did not cede any decisions to Jennifer, and instead petitioned the trial court for directions regarding estate planning and gave all interested parties, including Martin, an opportunity to participate in the proceedings and comment on what would be in Inez's best interests. In addition, the trial court ordered the presentation of legal briefs and conducted a two-day hearing in order to hear directly from the interested parties and their supporting witnesses. Also, the record indicates the trial court carefully weighed and considered the undisputed facts, testimony which was on some points conflicting, exhibits, and relevant law, before the trial court, not Jennifer, made the decision about whether to proceed with an amendment to the 2015 estate plan. Thus, the contention that the trial court condoned an impropriety between the estate guardian and the personal guardian is not supported by the record.

¶ 59     Martin's next argument is that the trial court's decision should be reversed because the court employed the incorrect burden of proof at the best interests hearing. Martin criticizes *Howell* because we did not announce the burden of proof to be used at the best interests hearing that would be conducted on remand. *Howell*, 2015 IL App (1st) 133247, ¶ 41. It would have

been inappropriate, however, for this court of review to decide an issue that the parties had never argued and the trial court had never addressed. *Howell* was a case of first impression in which the trial court had ruled, as a matter of law, that the adult disabled ward's estate plan must follow the rules of intestacy and had refused to conduct an evidentiary hearing into the ward's best interests. *Howell*, 2015 IL App (1st) 133247, ¶ 1. On appeal, we concluded that the ruling was in error and we remanded the case with directions to proceed with the evidentiary hearing that the co-guardians were seeking. *Howell*, 2015 IL App (1st) 133247, ¶ 36. On remand, those parties would have been given their first opportunity to argue for a specific evidentiary standard. No subsequent appeal was taken, and we do not know what standard was used in the proceeding.

¶ 60    Martin contends the trial court that considered Inez's best interests incorrectly adopted the evidence standard set out in *Michalak*. *Michalak*, 404 Ill. App. 3d 75. He cites *Board of Education of the City of Chicago v. State Board of Education*, 113 Ill. 2d 173, 191-92, 497 N.E.2d 984, 991-92 (1986), for the proposition that courts use different evidentiary standards to resolve different types of questions. Whether the trial court applied the correct burden of proof is a question of law that we review *de novo*. *Gataric v. Colak*, 2016 IL App (1st) 151281, ¶ 14, 59 N.E.3d 109.

¶ 61    In *Michalak*, which was decided five years before *Howell*, we held that a petition to amend an adult disabled ward's trust is subject to the preponderance of the evidence standard. *Michalak*, 404 Ill. App. 3d at 96. We remarked that it would be inappropriate to use the clear and convincing standard because the petition did not concern a personal issue such as withdrawing life-sustaining treatment or invoking extraordinary mental health measures. *Michalak*, 404 Ill. App. 3d at 96. When addressing the petition regarding Inez's estate plan, the trial court not only considered *Michalak*'s analysis, but also reasoned that when the legislature believes the best interest of the ward should be demonstrated by clear and convincing evidence, the legislature expressly adds that standard to the Probate Act, as it did in the sections regarding whether to terminate a ward's marriage or whether to have a ward sterilized, but that standard was not incorporated into section 11a-18, which is the section relevant to these proceedings. 755 ILCS 5/11a-18 (West 2016).

¶ 62    Martin argues that *Michalak* is not on point because it was not dealing with the peculiar facts of this case, in which a disabled ward's biological parent and some of that parent's other children who did not have a relationship with the disabled ward were being disinherited. Martin contends that the clear-and-convincing evidence standard should have been applied because "there is a strong public policy interest in protecting disabled persons and the inheritance rights of their blood relatives." Martin also contends the ruling does not promote Inez's relationships with the relatives who were disinherited. He cites *In re Mark W.*, 228 Ill. 2d 365, 374-75, 888 N.E.2d 15, 20 (2008), for the proposition that a person who has been adjudicated as disabled is viewed as a favored person entitled to the court's vigilant protection. He does not cite any authority indicating it is good public policy to support inheritance expectations of a disabled ward's relatives. He also relies on *In re Estate of Hook*, 207 Ill. App. 3d 1015, 1029, 566 N.E.2d 759, 768 (1991), for the proposition that the clear and convincing standard is applied to prevent inheritance by someone who has murdered the person from whom he or she stands to inherit. Martin argues, "There is something fundamentally wrong with a ruling which makes it easier to be disinherited for not visiting enough or for having extramarital affairs than it is for murder."

- 17 -

¶ 63    We decline Martin's invitation to disagree with *Michalak*, as that case involved similar circumstances. Also, because this case involved the disposition of a disabled ward's estate, not the ward's person, we decline to endorse an evidentiary standard that is relevant to questions regarding the ward's person (sterilization or dissolution of marriage).

¶ 64    Martin's last contention is that it was an abuse of discretion for the trial court to conclude that Martin did not have a substantial relationship with his daughter, even though it was her mother who impeded that relationship by not allowing him to visit. Martin contends Jennifer had sole discretion over whom to admit to the Orland Park residence and that although he and others wanted to visit Inez, Jennifer was the gatekeeper. Martin filed a visitation petition on December 10, 2015, but the trial court denied the petition due to settled authority, *Struck*, which indicates that a relative of a disabled adult ward has no standing to assert a right to visit the ward and challenge the decisions of the guardian of the person to deny visitation. *Struck v. Cook County Public Guardian*, 387 Ill. App. 3d 867, 876, 901 N.E.2d 946, 954 (2008). Martin argues that *Struck*, which prevented him from visiting Inez, and *Howell*, which indicated deviating from intestacy may be in the best interest of a disabled ward, work together as a "legal non-compete agreement against any blood relative whom Jennifer seeks to disinherit." Martin contends that once Jennifer had the sole discretion to decide whether Martin could visit Inez, it was inevitable that Jennifer would unjustly end his visits.

¶ 65    Jennifer and the guardian *ad litem* respond that the trial court properly considered the evidence, and made sound credibility determinations, before concluding that Martin did not have a loving and consistent relationship with Inez.

¶ 66    We review the trial court's evidentiary ruling for an abuse of discretion. *In re Rocker*, 2017 IL App (4th) 170133, ¶¶ 38-39, 92 N.E.3d 988. A court abuses its discretion where its decision is arbitrary, fanciful or unreasonable, or when no reasonable person would take the same view. *Rocker*, 2017 IL App (4th) 170133, ¶ 39; *Lisowski v. MacNeal Memorial Hospital Ass'n*, 381 Ill. App. 3d 275, 288, 885 N.E.2d 1120, 1134 (2008).

¶ 67    The record indicates that the best interests hearing and the trial court's ruling encompassed Inez's entire life, not just her recent adulthood, which is when Martin petitioned for visitation. The trial court determined that the credible evidence indicated Martin had chosen not to be involved in Inez's life and to care for her, even when she was an infant in 1995, when he had the unfettered ability to spend time with her and care for her; even when she was confined to the rehabilitation center as a young child, where he could visit her freely; and even later, after 2005, when she was still a minor and sometimes hospitalized for long periods when she was not living in the Orland Park residence with her mother. It was not until shortly after Inez's 18th birthday in 2013 that she was adjudicated a disabled adult, Jennifer was appointed as the sole guardian of Inez's person, Jennifer then had sole authority over visitation questions with her adult child, and Jennifer decided that she would no longer permit Martin to visit Inez. Only then did *Struck* and *Howell* become relevant. The record indicates that Martin showed little to no interest in his daughter since her birth in 1995. He did not care for her and create a relationship with her when she was a child and when he had the unfettered legal right to be a part of her life. When Inez was older, Martin did not oppose her mother's petition to be appointed as the sole guardian of their adult daughter, and he did not petition for visitation until almost three years later, in 2015. By 2015, Martin had created a 20-year track record of disinterest and lack of concern for Inez's health and wellbeing. Martin consistently chose not to have a close relationship with Inez. The amendment to her estate plan did not occur because

of recent case law, and it did not occur because of Jennifer's recent decision to deny visitation with her adult child, which she attributed to Martin's intention only to avoid being excluded from the estate, rather than to a newfound interest in their eldest daughter. The amendment occurred because the competent record showed that it was in Inez's best interests to distribute the estate remaining after her death only to her close and loving family members and to exclude other people whose only claim to the assets was through the rule of intestacy. Martin has failed to present any reason to disturb the trial court's ruling at the conclusion of the best interests hearing and we affirm that ruling.

¶ 68          Affirmed.